# 15-2468

*To Be Argued By*:
PATRICK T. HEIN

---

# United States Court of Appeals

## For the Second Circuit

◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

SHERMAN BARRO,

*Defendant-Appellant.*

---

**On Appeal From The United States District Court
For The Eastern District of New York**

---

**BRIEF AND APPENDIX FOR THE UNITED STATES**

---

ROBERT L. CAPERS,
*United States Attorney,*
*Eastern District of New York.*

JO ANN M. NAVICKAS,
PATRICK T. HEIN,
   *Assistant United States Attorneys,*
      *Of Counsel.*

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..........................................iii

PRELIMINARY STATEMENT..........................................1

STATEMENT OF FACTS.............................................3

    I.    Background...........................................3

        A.    The Indictment And Pretrial
              Proceedings.....................................3

            1.    Indictment................................3

            2.    Motion To Suppress........................4

    II.  The Speedy Trial Motion..............................6

    III. Reindictment And Trial..............................12

        A.    The Government's Case..........................12

        B.    The Defense's Case............................14

        C.    The Verdict And Sentence......................15

ARGUMENT......................................................16

POINT ONE - THE COURT DID NOT ABUSE ITS DISCRETION
           IN DISMISSING THE INDICTMENT WITHOUT
           PREJUDICE FOR THE SPEEDY TRIAL ACT VIOLATION.......16

    I.    The Applicable Law..................................16

        A.    General Principles............................16

            1.    The Seriousness Of The Offense............18

            2.    The Facts And Circumstances
                Leading To The Violation..................19

            3.    The Impact Of Reprosecution On The
                Act And The Administration Of Justice......20

            4.    The Prejudice To The Defendant............21

B.   The Standard Of Review..........................22

II.  The District Court Did Not Abuse Its
     Discretion In Dismissing The Indictment
     Without Prejudice..................................22

     A.   The Seriousness Of The Offense.................23

     B.   The Facts And Circumstances Leading
          To The Violation..............................27

     C.   The Impact Of Reprosecution On The
          Act And The Administration Of Justice..........32

     D.   The Prejudice To The Defendant.................35

POINT TWO - THE TRIAL COURT CORRECTLY FOUND THAT
          THE GOVERNMENT'S RACE-NEUTRAL AND
          NATIONAL-ORIGIN-NEUTRAL EXPLANATION
          FOR STRIKING JUROR 17 WAS NOT PRETEXTUAL..........39

     I.   Factual Background..................................39

          A.   Initial Batson Challenge.......................39

               1.  Juror 3..................................40

               2.  Juror 18.................................41

               3.  Juror 17.................................42

          B.   Renewed Batson Challenge: Juror 24.............43

     II.  The Applicable Law..................................45

          A.   The Batson Ruling.............................45

          B.   The Standard Of Review........................48

     III. The Government's Explanation For Striking
          Juror 17 Was Not Inherently Discriminatory
          Under Batson Step Two..............................49

     IV.  The Trial Court's Finding That The
          Government's Race-Neutral And
          National-Origin-Neutral Explanation
          Was Not Pretextual Was Not Clear Error..............54

CONCLUSION.................................................59

iii

TABLE OF AUTHORITIES

Page

CASES

Barker v. Wingo,
  407 U.S. 514 (1972) ........................................ 21

Barnes v. Anderson,
  202 F.3d 150 (2d Cir. 1999) ............................... 48

Batson v. Kentucky,
  476 U.S. 79 (1986) .................................... 45, 47

Galarza v. Keane,
  252 F.3d 630 (2d Cir. 2001) ........................... 53 n.18

Hernandez v. New York,
  500 U.S. 352 (1991) ................................... passim

Hernandez v. Texas,
  347 U.S. 475 (1954) .................................. 46 n.17

J.E.B. v. Alabama ex rel. T.B.,
  511 U.S. 127 (1994) ....................................... 45

Johnson v. United States,
  520 U.S. 461 (1997) ....................................... 50

McKinney v. Artuz,
  326 F.3d 87 (2d Cir. 2003) ................................ 49

Murchu v. United States,
  926 F.2d 50 (1st Cir. 1991) ......................... 46 & n.16

Pemberthy v. Beyer,
  19 F.3d 857 (3d Cir. 1994) ................................ 46

Purkett v. Elem.,
  514 U.S. 765 (1995) ................................... 48, 53

Rico v. Leftridge-Byrd,
  340 F.3d 178 (3d Cir. 2003) ............................... 46

Rodriguez v. Shriver,
  392 F.3d 505 (2d Cir. 2004) ....................... 45, 51, 52

Roman v. Abrams,
  822 F.2d 214 (2d Cir. 1987) ................................. 45

United States v. Alvarado,
  951 F.2d 22 (2d Cir. 1991) ................................. 51

United States v. Bert,
  - F.3d -, 2016 WL 805303 (Feb. 9, 2016) ............... 17 n.8

United States v. Bert,
  - F.3d -, 2016 WL 493249 (Feb. 9, 2016) ................ passim

United States v. Bert,
  801 F.3d 125 (2d Cir. 2015) ........................ 17 n.8, 26

United States v. Biaggi,
  909 F.2d 662 (2d Cir. 1990) ................................. 46

United States v. Brown,
  770 F.2d 241 (1st Cir. 1985) ............................... 23

United States v. Diaz,
  176 F.3d 52 (2d Cir. 1999) ................................. 47

United States v. Douglas,
  525 F.3d 225 (2d Cir. 2008) ............... 54-55 & n.20, 56-57

United States v. Franklyn,
  157 F.3d 90 (2d Cir. 1998) ................................. 48

United States v. Gelb,
  881 F.2d 1155 (2d Cir. 1989) ............................... 45

United States v. Giambrone,
  920 F.2d 176 (2d Cir. 1990) ................. 23, 26, 27, 31, 34

United States v. Hernandez,
  863 F.2d 239 (2d Cir. 1988) .............................. 19-20

United States v. Hicks,
  2015 WL 4162785 (D. Col. July 10, 2015) ................... 24

United States v. Kiszewski,
  877 F.2d 210 (2d Cir. 1989) ............................ 22, 28

United States v. Mancuso,
  302 F. Supp. 2d 23 (E.D.N.Y. 2004) ..................... 25, 38

United States v. Marino,
  277 F.3d 11 (1st Cir. 2002) ................................ 46

United States v. Marion,
  404 U.S. 307 (1971) ....................................... 22

United States v. Martinez,
  621 F.3d 101 (2d Cir. 2010) .............................. 45

United States v. Montecalvo,
  861 F. Supp. 2d 110 (E.D.N.Y. 2012) .................... 25, 26

United States v. Olano,
  507 U.S. 725 (1993) ....................................... 50

United States v. Rodriguez,
  617 F. Supp. 788 (E.D.N.Y. 1985) .......................... 23

United States v. Russo,
  741 F.2d 1264 (11th Cir. 1984) .......................... 23-24

United States v. Simmons,
  786 F.2d 479 (2d Cir. 1986) ........................... passim

United States v. Solnin,
  81 F. Supp. 3d 193 (E.D.N.Y. 2015) .................... 24, 25

United States v. Stayton,
  791 F.2d 17 (2d Cir. 1986) .................... 23, 26, 27, 37

United States v. Taylor,
  487 U.S. 326 (1988) ................................... passim

United States v. Thomas,
  274 F.3d 655 (2d Cir. 2001) .............................. 50

United States v. Ward,
  2015 WL 1959631 (D. Kan. Apr. 29, 2015) .................. 24

United States v. Wells,
  893 F.2d 535 (2d Cir. 1990) ................... 19, 28 n.11, 30

United States v. Wilson,
  11 F.3d 346 (2d Cir. 1993) ...................... 18, 20, 28

Zedner v. United States,
  547 U.S. 489 (2006) .............................. 17, 20, 21

## STATUTES AND RULES

18 U.S.C. § 3161(c)(1) ........................................ 17

18 U.S.C. § 3162(a)(2) ..................................... 17, 18

21 U.S.C. § 952(a) ........................................... 26

Fed. R. Crim. P. 52(b) ....................................... 50

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 15-2468

UNITED STATES OF AMERICA,

Appellee,

-against-

SHERMAN BARRO,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Defendant-Appellant Sherman Barro appeals from a
judgment entered on July 22, 2015, in the United States District
Court for the Eastern District of New York (Korman, J.),[1]
convicting him, after a jury trial, of importing cocaine into
the United States, in violation of 21 U.S.C. § 952(a), and of
possessing cocaine with the intent to distribute, in violation

---

[1]     The case was reassigned from United States District
Judge Nicholas G. Garaufis to Judge Korman on August 4, 2014.

2

of 21 U.S.C. § 841(a)(1).  The district court sentenced Barro to 32 months' imprisonment, to be followed by five years' supervised release, and a $200 special assessment.  He is currently incarcerated.

On appeal, Barro argues that the district court abused its discretion in dismissing the indictment against him without prejudice for a violation of Barro's statutory right to a speedy trial.  Barro also contends that the court erred in finding that the government's race-neutral and national-origin-neutral explanation for striking a black female juror was not pretextual.

As we show below, these arguments are without merit.

STATEMENT OF FACTS

I.   Background

On January 31, 2012, Sherman Barro and his family arrived at John F. Kennedy International Airport ("JFK Airport") aboard a Caribbean Airlines flight from Kingston, Jamaica. During a routine inspection, a United States Customs and Border Protection ("CBP") official discovered cocaine secreted in the bottoms of Barro's luggage, and Barro was arrested. Ultimately, it was determined that Barro had transported over nine pounds of cocaine into the United States.

A.   The Indictment And Pretrial Proceedings

1.   Indictment

On February 29, 2012, a grand jury in the Eastern District of New York returned a two-count indictment charging Barro with importing cocaine into the United States, in violation of 21 U.S.C. § 952(a), and possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). (A 5, Dkt. No. 6).[2] Barro pleaded not guilty at his arraignment on March 9, 2012 (A 5, Dkt. No. 8), and, on April 6, 2012, he was released on an unsecured bond of $100,000 (A 5, Dkt. No. 11).  Barro remained at liberty from April 6, 2012, until the

---

[2]   References to "A" and "GA" are to Barro's appendix and the government's appendix, respectively; references to "T" are to the trial transcript.

4

district court remanded him on October 20, 2014, after a jury
found him guilty on both counts of the indictment. (A 17, Dkt.
No. 53).

### 2. Motion To Suppress

On December 4, 2012, Barro filed an untimely motion[3] to
suppress statements that he had made after his arrest. (A 6,
Dkt. No. 19). On January 16, 2013, after the suppression motion
had been fully briefed, the district court referred the motion
to United States Magistrate Judge Lois Bloom for an evidentiary
hearing and scheduled the case for trial on April 4, 2013.
(A 6, Dkt. No. 26).

Magistrate Judge Bloom conducted an evidentiary
hearing on February 13, 2013, invited post-hearing briefing, and
set a briefing schedule. (A 8, February 13, 2013 Minute Entry).
Barro twice sought and obtained extensions of time to file his
post-hearing brief. (A 8, Dkt Nos. 34, 36). By March 7, 2013,
approximately one month before Barro's scheduled trial date,
post-hearing briefing on the suppression motion had finally been
completed. (A 8, Dkt. No. 38). On March 22, 2013, Magistrate
Judge Bloom issued a Report and Recommendation ("R&R") in which

---

[3] Under the briefing schedule established by the
district court, Barro's motion to suppress was due on November
21, 2012. Barro, however, inexplicably filed his motion two
weeks late, on December 4, 2012. (A 6, Dkt. Nos. 19-22; A 43-
50).

she recommended suppression of Barro's post-arrest statements.
(A 9, Dkt. No. 43).

The district court held a status conference on March
25, 2013, at which time the government indicated that it planned
to file objections to the R&R. (A 9, Dkt. No. 47). The court
then set a briefing schedule for filing objections to the R&R
and excluded time, on the basis of motion practice, until May 3,
2013, at which time a hearing would be held. (A 9). The
government timely filed its objections to the R&R on April 5,
2013. (A 9, Dkt. No. 46). Although Barro's responsive papers
were due on April 15, 2013, his response was not filed until
over a week later, on April 23, 2013. (A 9, Dkt. Nos. 47, 48).

The district court thereafter adjourned the motion
hearing to June 19, 2013, due to the court's unavailability.
(A 9, Dkt. No. 50). On that date, the court held oral argument
on the government's objections to the R&R and reserved decision.
(Id.).

On July 29, 2013,[4] the district court issued an opinion
sustaining the government's objections to the R&R and denying
Barro's motion to suppress his post-arrest statements. (A 10,
Dkt. No. 52). The court did not set a status conference at that
time. Shortly thereafter, however, the parties began discussing

---

[4] The court's order was not entered on the docket until
August 2, 2013. (A 10, Dkt. No. 52).

a possible plea disposition of the case in light of the Department of Justice's review of the policies governing disposition of narcotics cases, i.e., the issuance of the Holder Memorandum.[5] (A 52-53; see also 63-64).

## II. The Speedy Trial Motion

The district court set a status conference in the case for February 26, 2014. (A 10, Dkt. No. 53). At the status conference, the government advised the court that, pursuant to its calculations, the matter was in violation of 18 U.S.C. § 3161 et seq. (the "Speedy Trial Act" or "Act") as more than 70 days had elapsed from the filing of the indictment, and it also informed the court that it had advised defense counsel of that fact over the weekend. (A 52). In particular, there had been no exclusion of time under the Act from July 19, 2013 (30 days

---

[5]    On August 12, 2013, Attorney General Eric Holder issued a memorandum to United States Attorneys concerning revisions to the Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases. As a result of the Holder Memorandum, the United States Attorney's Office for the Eastern District of New York (the "Office") ultimately adopted a revised plea offer policy whereby certain drug couriers were considered eligible not only for a non-mandatory or lower minimum sentence plea offer (the Office's "bump-down" plea offer policy) but also for an additional four-level reduction in the applicable United States Sentencing Guidelines ("Guidelines") range. In addition, the Office's former policy that a drug courier defendant who filed pretrial motions was not eligible for a bump-down benefit was revised so that a defendant who filed such motions prior to the issuance of the Holder Memorandum nevertheless could receive the benefits of the Holder Memorandum and the revised "bump-down" policy. (A 31).

from the date of the hearing on the government's objections to the R&R) until the date of the status conference, February 26, 2014. (Id.).

In explaining the government's "oversight," the prosecutor noted that when the district court's decision concerning the suppression of Barro's statements was issued she was on trial, and that other factors, such as policy changes in external courier cases that had arisen as a result of the issuance of the Holder Memorandum, also complicated the analysis. (A 52-53). The prosecutor represented that she had spoken to Barro's counsel about the possibility of a plea disposition in the case, and the district court ordered an exclusion of time - from February 26, 2014 until April 3, 2014 - under 18 U.S.C. § 3161 ("interests of justice") to enable the parties to explore that possibility. (A 52-55).

On April 7, 2014, Barro filed a motion to dismiss the indictment with prejudice. (A 25-28). Barro argued that he was only a low-level narcotics offender whose involvement in the instant offense did not involve violence or weapons and thus his crimes were not sufficiently "serious" to warrant reindictment. (A 27). He also contended that the Speedy Trial Act violation could have been avoided by the government's obtaining an "interests of justice" exclusion and that the government's

8

failure to do so negatively impacted the administration of justice. (Id.). Finally, Barro represented that he had suffered "very real prejudice" as a result of the Speedy Trial Act violation. (A 28). He noted that the indictment had resulted in a six-month jail sentence for his violation of probation on state charges and that he had suffered from anxiety over the threat of a trial and subsequent deportation. (Id.).

The government agreed that the indictment should be dismissed but argued that it should be without prejudice. (A 29-42). First, the government noted that the seriousness of the crimes – the importation and possession of over four kilograms of cocaine – was undeniable even in light of recent changes in Department Of Justice narcotics policy. (A 35). Second, the government argued that the delay did not involve bad faith, "a truly neglectful attitude," a "pattern of neglect," or other serious misconduct on its part. (A 36). Indeed, the government had moved to exclude time at every status conference between Barro's indictment and the district court's final decision on Barro's motion on July 29, 2013. (A 38). Moreover, although the government conceded that it had erred in failing to request a status conference immediately after the suppression motion had been decided, it argued that it could have moved for an exclusion of time in the interests of justice in light of

ongoing plea negotiations it had initiated in mid-August after the issuance of the Holder Memorandum.  (A 31, 38).  Third, the government contended that dismissal without prejudice was warranted because permitting reprosecution would not unduly impair the goals of the Speedy Trial Act, whereas greater harm would come from outright dismissal of serious drug crimes. (A 39-40).  Finally, the government noted that Barro had not demonstrated any prejudice as a result of the government's violation: no evidence had disappeared; no disruption of his employment had resulted; and no additional time was served in state confinement as a result of the delay, because, contrary to Barro's representations, his violation of probation had resulted solely from his decision to travel outside the United States without permission, which was a violation of the conditions of his state probation.  (A 41-42).  Indeed, even after the government had brought the Speedy Trial Act violation to light, Barro agreed to an additional exclusion of time to consider another possible plea disposition in the case.  (A 41).

On May 14, 2014, the district court heard argument on Barro's motion to dismiss the indictment with prejudice, at which hearing the parties reiterated many of the arguments raised in their letter briefs.  (A 56-68).  Much of the argument was devoted to the issue of the "seriousness" of the offense in

light of the issuance of the Holder Memorandum. Notably, however, Barro's counsel, did not dispute the fact that the government had re-engaged him in plea negotiations shortly after the issuance of the memorandum. (A 63-64).

On May 15, 2014, the district court rejected Barro's motion for a dismissal of the indictment with prejudice, by balancing various statutory and common law factors. (A 69-83).

First, the district court found that the charged crimes of importing and possessing cocaine were "serious," involving as they did sentences of imprisonment of between over four and over five years. In reaching this conclusion, the court acknowledged – as Barro had argued - that the norms of culpability of low-level, non-violent drug offenders had evolved, and that there had been movement both on the charging and sentencing sides to reduce the punishment of such offenders. (A 76-77).

Second, the district court found that the violation of the Speedy Trial Act had resulted from - "at worst" - government negligence, as Barro himself had suggested in arguing that there was no evidence of "bad faith" on the part of the government nor any pattern of systemic neglect. (A 79). Indeed, the court found that there was no evidence that the violation was "due to anything other than the Government counsel's negligent failure

to request a speedy trial exclusion in the interests of justice on July 19, 2013, after the fully-briefed motion to suppress had been taken under advisement by the district court for 30 days, or after August 2, 2013, the point at which the court had issued a decision on the motion." (Id.). Moreover, the court pointed out that the government had otherwise "generally adhered to the briefing schedules set by the court and the magistrate judge and vigorously litigated the suppression motion." (Id.).

Third, the district court found that the remedy provisions of the Speedy Trial Act were designed to promote compliance with the Act's provisions without needlessly subverting important criminal prosecutions. Noting that even the defense had conceded that the cause of the violation appeared to be "an isolated act of negligence," the court held that dismissing the case without prejudice should serve as sufficient sanction against the government's violation. (A 78-80). It further noted that dismissal without prejudice would "ensure[] compliance with the demands of the Speedy Trial Act and with the societal demand that those accused of serious crimes be dealt with according to law." (A 80).

Finally, the district court found that the five-month, non-excludable delay in the case, though "certainly more than trifle," did not trigger a presumption of prejudice.

(A 82). Barro had been free on bond since April 2012, which had allowed him time to work and to spend time with his family, including permitting him an opportunity to experience the birth of a second child. (A 81). Further, the court noted that Barro did not claim, nor did it appear, that the delay had prejudiced his ability to mount a defense. (A 82). Moreover, the court noted that any general anxiety that Barro was experiencing as a result of having federal charges and the prospect of deportation "hanging over" him "was hardly attributable to the additional delay." (Id.). Indeed, the court pointed out that "even after the violation of the Speedy Trial Act became evident, [Barro] [had] requested [an] additional exclusion of time while he negotiated a more favorable plea agreement with the Government . . . [, thus] demonstrat[ing] a desire to take as much time as was necessary to arrange a plea agreement." (A 82-83).

III. Reindictment And Trial

On June 20, 2014, the government obtained a new indictment in the case. (A 14, Dkt. No. 6).

A.    The Government's Case

At trial, the government proved the following facts:

On January 31, 2012, Barro, his wife, and infant son arrived at JFK Airport in Queens, New York, aboard Caribbean Airlines Flight No. BW-15 from Kingston, Jamaica. (T 44-45). A

CBP officer, Eugene Covelli, performed a routine inspection of one of Barro's two checked bags, during which he noticed a smell similar to nail polish remover (acetone) - typical of narcotics that have been concealed for a period of time – emanating from the bag; he further noticed that the bag was heavier than normal and that the bottom of the bag was "unusually thick." (T 63-65, 73, 120). Officer Covelli also took note of the fact that several sets of children's clothing, particularly pajamas, had been placed along the bottom of the inside of the bag.[6] (T 63-64, 68). When Officer Covelli probed the bottom of the bag, he discovered a white powdery substance inside, which substance field-tested positive for the presence of cocaine. (T 65, 71-72).

The discovery of cocaine in Barro's first bag led Officer Covelli to examine Barro's remaining checked bag. (T 72). That bag also contained an unusually thick bottom, which was covered by several sets of children's pajamas. (T 72-73). A probe of the bottom of that bag again revealed the presence of cocaine. (Id.). The combined net weight of the cocaine concealed under the false bottoms of the two bags was

---

[6]     At this point, Officer Covelli also noticed that Barro was acting unusually nervous and that his carotid artery was pumping rapidly. (T 63).

14

4,198 grams (over nine pounds), with an average purity level of 69.7 percent.  (T 177-79).

　　　　　After his discovery of the cocaine, Officer Covelli contacted agents from the United States Department of Homeland Security ("DHS").  (T 74-75).

　　　B.　　The Defense's Case

　　　　　Barro testified that he and his wife flew separately to her grandfather's funeral, which was on January 29, 2012. (T 350, 361).  Although Barro left on Thursday, January 26, purportedly to celebrate his father's birthday on Saturday, January 28, he did not stay with his father on Thursday or Friday night because his father had to work on Friday.  (T 361, 371).  Instead, Barro stayed at his friend Dwayne's grandmother's house.  (T 364, 366).

　　　　　Barro eventually met his father on Saturday afternoon and spent that night at his father's house, without his luggage. (T 292, 295).  On Sunday, Barro attended his wife's grandfather's funeral with his wife and son and spent Monday with his wife's family.  (T 257-58, 297, 375-76).

　　　　　It was not until Tuesday, January 31, that Barro went back to Dwayne's house to collect his luggage.  (T 300, 377). At that time, Barro observed that his bags were not in the same condition that he had left them; items had been taken out of the

15

bags and were lying on the bed. (T 378). Nevertheless, he never questioned anyone about the bags or what had happened to them. (T 378).

Because Barro's wife's bag was overweight, Dwayne lent Barro a bag and told him to return it to a mutual friend in Brooklyn.[7] (T 301, 379-80, 382). Although Barro's father searched that bag, he found nothing unusual. (T 301-03, 321). Neither did Barro. (T 383, 396).

C. The Verdict And Sentence

The jury convicted Barro of both counts of the indictment. (T 536-38). On July 22, 2015, the district court sentenced Barro to 32 months' incarceration and five years of supervised release. (A 19, Dkt. No. 69).

---

[7] On cross-examination, Barro testified that he had advised DHS agents that he and his family were to be picked up by an individual named "Reds" to whom Barro planned to give the bag. (T 417-18). Notably, Barro had told Officer Covelli that he was planning to take a taxi home. (T 62).

ARGUMENT

POINT ONE

THE COURT DID NOT ABUSE ITS DISCRETION
IN DISMISSING THE INDICTMENT WITHOUT
PREJUDICE FOR THE SPEEDY TRIAL ACT VIOLATION

Barro contends that his conviction must be reversed because the district court purportedly abused its discretion in dismissing his indictment without prejudice following the Speedy Trial Act violation below. Specifically, Barro argues that the indictment should have been dismissed with prejudice because his narcotics crimes were not "serious," the seven-and-a-half-month delay was neither excused nor isolated, and he suffered great anxiety as a result of having a trial and his possible deportation hanging over him during that time. (Br. 18-30).

This claim is unavailing. The district court properly exercised its discretion in holding that Barro – who was not in federal custody during the period of the Speedy Trial Act violation – should not be permitted to avoid prosecution for the serious narcotics crimes with which he was charged as a result of the government's unwitting violation of that Act.

I.    The Applicable Law

A.    General Principles

The Speedy Trial Act requires that a defendant's trial start within 70 days from the filing of the information or

indictment or "from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1).  If that deadline is not met, the Act provides that the indictment "shall be dismissed on motion of the defendant."  18 U.S.C. § 3162(a)(2).  See also Zedner v. United States, 547 U.S. 489, 499 (2006) ("if a meritorious and timely motion to dismiss is filed [by the defendant], the district court must dismiss the charges, though it may choose whether to dismiss with or without prejudice.").

Dismissal of the indictment for a Speedy Trial Act violation may be with or without prejudice to reprosecution. There is no presumption, however, as to which is the appropriate remedy for a violation of the Act.  See United States v. Bert, - F.3d -, 2016 WL 493249, at *5 (Feb. 9, 2016) (quoting United States v. Taylor, 487 U.S. 326, 334 (1988) ("Congress did not intend any particular type of dismissal to serve as the presumptive remedy for a Speedy Trial Act violation."))[8]; United

---

[8]    Barro relies heavily on this Court's recently withdrawn opinion, United States v. Bert, 801 F.3d 125 (2d Cir. 2015), in which a split panel of the Court reversed the district court's dismissal of the indictment without prejudice following a Speedy Trial Act violation.  On February 9, 2016, the same panel withdrew that opinion and remanded for further consideration of the Speedy Trial Act issue.  See Bert, 2016 WL 493249, at *1.  Additionally, the Court's denial of rehearing en banc in the case, see United States v. Bert, - F.3d -, 2016 WL

States v. Simmons, 786 F.2d 479, 485 (2d Cir. 1986) ("[T]here is no presumption in favor of dismissal with prejudice in this circuit."). Rather, the determination of whether to dismiss the indictment with or without prejudice is committed to the discretion of the district court. See United States v. Wilson, 11 F.3d 346, 352 (2d Cir. 1993).

In reaching its decision, the district court is required under the Speedy Trial Act to consider several statutory factors: "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." 18 U.S.C. § 3162(a)(2). In addition to these three statutory factors, "the Supreme Court has indicated that prejudice to the defendant should also be considered." See Wilson, 11 F.3d at 352 (citing Taylor, 487 U.S. at 333-34); see also Bert, 2016 WL 493249, *5.

1. The Seriousness Of The Offense

With respect to the first factor, the "seriousness" of the offense, this Court has held that "[w]here the crime charged is serious, the sanction of dismissal with prejudice should

_____

805303 (Mem.) (Feb. 9, 2016), led to a strong dissent authored by The Honorable Dennis Jacobs and joined by three other members of the Court (Cabranes, J., Livingston, D., and Raggi, R.).

ordinarily be imposed only for serious delay." Simmons, 786
F.2d at 485; see also Bert, 2016 WL 493249, at *6.

2. The Facts And Circumstances
Leading To The Violation

With respect to the second statutory factor, i.e., the
"facts and circumstances" of the delay, the Supreme Court has
made clear that the heavy sanction of dismissal of an indictment
with prejudice is not warranted absent a showing of more than
"an isolated unwitting violation" of the Speedy Trial Act by the
prosecutor. See Taylor, 487 U.S. at 339. Thus, dismissals with
prejudice generally require a showing of a "truly neglectful
attitude," "bad faith," a "pattern of neglect," or other serious
misconduct. Id. at 338-39; see also Bert, 2016 WL 493249, at *6
("[C]ourts should only preclude reprosecution of a serious crime
upon a showing of 'something more than an isolated unwitting
violation,' such as a finding of 'bad faith' or a 'pattern of
neglect.'") (internal citation omitted); United States v. Wells,
893 F.2d 535, 539 (2d Cir. 1990) ("To dismiss an indictment with
prejudice for a violation of the Speedy Trial Act, the court
should specifically describe the Government's conduct and find
that conduct to be more than 'an isolated unwitting violation,'
be it a 'truly neglectful attitude,' 'bad faith,' a 'pattern of
neglect,' or other serious misconduct.") (internal citations
omitted); United States v. Hernandez, 863 F.2d 239, 244 (2d Cir.

1988) ("[I]n the absence of a factually supported finding of bad faith or a pattern of neglect by the local United States Attorney, an 'isolated unwitting violation' of the Speedy Trial Act cannot support a decision to dismiss with prejudice.") (internal citation omitted); Simmons, 786 F.2d at 485-86 (dismissing indictment without prejudice in part because the speedy trial violation "did not involve intentional non-compliance with the Act, nor was it designed to gain a tactical advantage for the government.").

>   3.   The Impact Of Reprosecution On The
>        Act And The Administration Of Justice

As to the third factor, the impact of reprosecution on the administration of the Speedy Trial Act and justice generally, the Supreme Court has noted that the sanctions provisions of the Act are designed "to promote compliance with the Act without needlessly subverting important criminal prosecutions." Zedner, 547 U.S. at 499. Thus, the Court has explained that dismissal without prejudice is not a "toothless sanction," but, rather, "forces the Government to obtain a new indictment if it decides to reprosecute." Taylor, 487 U.S. at 342; see also Wilson, 11 F.3d at 353 (affirming district court's decision to dismiss indictment without prejudice because, "[w]hile we believe the Government bears some responsibility for the Speedy Trial Act violations, these violations were

adequately redressed by requiring the Government to seek another indictment"). "The less severe sanction (dismissal without prejudice) lets the court avoid unduly impairing the enforcement of federal criminal laws – though even this sanction imposes some costs on the prosecution and the court, which further encourages compliance." Zedner, 547 U.S. at 499.

4. The Prejudice To The Defendant

Lastly, a court should consider "prejudice" to the defendant resulting from a Speedy Trial Act delay. See Bert, 2016 WL 493249, at *7, *11. Indeed, in Taylor, the Supreme Court not only acknowledged that the length of the delay could be a "measure of the seriousness of the speedy trial violation," but also noted that "[t]he longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty." 487 U.S. at 340. Quoting the Court in Barker v. Wingo, 407 U.S. 514, 537 (1972), the Taylor Court wrote:

> [I]nordinate delay between public charge and trial, . . . wholly aside from possible prejudice to a defense on the merits, may "seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associates, subject him to public obloquy, and create anxiety in him, his family and his friends."

487 U.S. at 340 (quoting United States v. Marion, 404 U.S. 307, 320 (1971)).

B.    The Standard Of Review

In Taylor, 487 U.S. at 336-37, the Supreme Court held that "when the statutory factors are properly considered," in a manner that "clearly articulates their effect," and "supporting factual findings are not clearly in error, the district court's judgment of how opposing considerations balance should not lightly be disturbed."  See also United States v. Kiszewski, 877 F.2d 210, 214 (2d Cir. 1989) (while "[a]ppellant argues that the district court's conclusion on every statutory factor was wrong, [] our inquiry is not whether we agree with [the district judge's] assessment of each factor but only whether [the district judge] abused his discretion.").

II.  The District Court Did Not Abuse Its Discretion
     In Dismissing The Indictment Without Prejudice

Here, the district court did not abuse its discretion in dismissing the indictment without prejudice because it clearly, carefully and sensibly balanced the applicable factors set forth in the statutory and common law jurisprudence.  See Taylor, 487 U.S. at 336-37.  In doing so, the district court correctly found that all four factors weighed in favor of dismissal without prejudice: Barro's crimes were serious; the violation resulted from "at worst" the negligence of the

government; precluding reprosecution because of an unwitting violation would not further the interests of the Act and would negatively impact the administration of justice; and Barro was not prejudiced by the delay.

    A.   The Seriousness Of The Offense

        Courts have consistently held that narcotics charges – even those involving relatively small amounts of narcotics – are "serious" within the meaning of the Speedy Trial Act. See, e.g., Taylor, 487 U.S. at 338 (narcotics charges involving 400 grams of cocaine were "serious"); Simmons, 786 F.2d at 485 (possession of six glassine envelopes containing heroin with intent to distribute was "serious"); United States v. Giambrone, 920 F.2d 176, 181 (2d Cir. 1990) (distributing and conspiring to distribute eight ounces of cocaine considered "serious"); United States v. Stayton, 791 F.2d 17, 21 (2d Cir. 1986) (trafficking in 200 kilograms of a controlled substance considered "serious"); United States v. Brown, 770 F.2d 241, 244 (1st Cir. 1985) (offenses involving four ounces of cocaine considered "serious"); United States v. Russo, 741 F.2d 1264, 1267 (11th Cir. 1984) (drug offenses involving methaqualone considered "serious"); United States v. Rodriguez, 617 F. Supp. 788, 791 (E.D.N.Y. 1985) (charges pertaining to distribution and possession of cocaine with intent to distribute were "serious").

Indeed, even Barro concedes that "drug crimes are traditionally serious under the Speedy Trial Act." (Br. 23). Nevertheless, he maintains that the fact that he "was a non-violent, low-level offender should have weighed against finding his charged crimes serious here, especially in light of the government's own policy that non-violent, low-level drug offenses are not serious crimes." (Br. 23-24).

To the contrary, however, courts have continued to regard narcotics trafficking cases as serious within the meaning of the Speedy Trial Act even after the issuance of the Holder Memorandum. See, e.g., United States v. Hicks, 2015 WL 4162785, at *2 (D. Col. July 10, 2015) (finding felony drug charges to be "serious offenses" under the Speedy Trial Act); United States v. Ward, 2015 WL 1959631, at *3-4 (D. Kan. Apr. 29, 2015) (finding felony narcotics trafficking charges to be "serious" under the Speedy Trial Act).

Moreover, the precedent on which Barro relies supports the characterization of Barro's offenses as "serious." In United States v. Solnin, 81 F. Supp. 3d 193, 202 (E.D.N.Y. 2015), for example, the district court held that mail fraud counts that carried a maximum sentence of 20 years – the same sentence that Barro's counts carried after the issuance of the Holder Memorandum – "weigh[ed] in favor of the seriousness of

the offense."  Solnin also noted that "the non-violent nature of
an alleged crime does not necessarily render it non-serious."
Id. at 203 (internal quotations and citations omitted).
Similarly, the district court in United States v. Mancuso, 302
F. Supp. 2d 23, 26 (E.D.N.Y. 2004), held that check fraud
totaling approximately $590,600 and punishable by up to 10
years' imprisonment was serious.  And the district court in
United States v. Montecalvo, 861 F. Supp. 2d 110, 115 (E.D.N.Y.
2012), stated that it had "uncovered very few cases that deem a
crime 'non-serious' for Speedy Trial Act purposes."  These "non-
serious" crimes included mail theft, theft of $2,000 in
property, embezzlement of a $364 money order, and various
misdemeanors.  Id.

Given that Barro's narcotics crimes are far more
serious than any of the crimes identified in Montecalvo, the
district court's finding of seriousness here was correct.
(A 77).  As the court explained, both narcotics charges –
cocaine importation and possession of cocaine with the intent to
distribute – were Class B felonies punishable by a minimum of
five years and a maximum of 40 years in prison at the time of
indictment.  (A 76-77).  Further, even under the terms of the
Holder Memorandum, Barro faced a sentence of up to 20 years
imprisonment under 21 U.S.C. § 952(a), a Class C felony, and his

Guidelines were only reduced from 70 to 87 months to 51 to 63 months.[9]  (A 77).  The court thus was right to find that Barro faced a significant sentence.  (Id.).

Further, the district court was not required, as Barro contends, "to weigh the seriousness of the charges against the seriousness of the delay" as a separate factor.  (Br. 24).  As this Court explained in Bert, "[t]he seriousness of the delay is not a standalone factor . . . .  [T]he length of the delay is a component of both the 'facts and circumstances' factor and the 'prejudice' factor, and together these two factors determine the seriousness of the delay."  2016 WL 493249, at *6.

Indeed, even the precedent upon which Barro relies – Giambrone and Stayton – did not weigh the seriousness of the charges against the seriousness of the delay.[10]  Rather, the courts in those cases considered the length of the delay under the "prejudice" and "facts and circumstances" factors, respectively.  In Giambrone, this Court affirmed the district court's finding that "the other two factors" – "the

---

[9]    Barro's contention that his ultimate sentence of 32 months' imprisonment "further suggested that the trial court did not view his offenses as especially egregious" is baseless. Barro faced 51 to 63 months' imprisonment at the time the Speedy Trial Act motion was heard; what sentence a different judge who presided over the trial ultimately gave Barro is irrelevant.

[10]    The remaining case upon which Barro relies, Bert, 801 F.3d at 131, has been withdrawn, as noted above.

circumstances leading to the dismissal" and "the impact of a reprosecution on the administration of the Act and on the administration of justice" – "outweighed" the seriousness of the crime and thus "demanded dismissal [with prejudice]." 920 F.2d at 181. In reaching that conclusion, the Giambrone Court analyzed the length of the delay under the "prejudice to the defendant" factor. Id. at 180 ("The longer the delay, the greater the presumptive or actual prejudice to the defendant") (citation omitted). In Stayton, the Court analyzed the seriousness of the delay under the second of the four factors, the "facts and circumstances" factor. Id., 791 F.2d at 22 ("In the context of this case, the enormity of the delay [23 months] is sufficient alone to tip this second factor [facts and circumstances] in favor of dismissal of the indictment with prejudice.")

> B.   The Facts And Circumstances
>      Leading To The Violation

As noted above, the Supreme Court and this Court have generally found dismissal with prejudice appropriate only where the Speedy Trial Act violation was caused by a pattern of neglect, or where the violation prejudiced the defendant to a degree that his trial rights were violated. See Taylor, 487 U.S. 340-41; see also Giambrone, 920 F.2d at 180, 182 (prosecution's attitude towards the Act was "extremely lax" and

"troublesome," there was "a pattern of speedy trial neglect" in the United States Attorney's office for the Western District of New York, and defendant had indicated his own readiness for trial and had opposed delays).

Likewise, this Court has generally affirmed district courts' decisions to dismiss an indictment without prejudice where there was no showing of a truly neglectful attitude by the government or actual prejudice to the defendant. See Kiszewski, 877 F.2d at 213-14 (majority of 200-day delay caused by circumstances related to defendant's representation, government's violation not intentional, and no evidence of prejudice); Wilson, 11 F.3d at 352 (continuances leading to 42-day delay in filing indictment consented to by defendant and government had not shown "lackadaisical attitude" or "pattern of neglect"); Simmons, 786 F.2d at 485-86 (significant portion of almost four-month delay was excludable, government's violation not intentional or "designed to gain a tactical advantage," and no evidence of prejudice).[11]

---

[11]     By the same logic, this Court has found dismissals with prejudice to be an abuse of discretion where there was no showing of a truly neglectful attitude by the government or actual prejudice to the defendant. See, e.g., Wells, 893 F.2d at 539-40 (finding district court's dismissal with prejudice to be an abuse of discretion where there was a 32-day delay beyond the 30-day indictment deadline, no evidence of bad faith or a neglectful attitude on part of government, and no prejudice to defendant).

Here, by contrast, there was no evidence to suggest that the Speedy Trial Act violation resulted from anything more than the government's negligence, as the district court correctly found. (A 77-79). For example, the court noted that the government had adhered to the briefing schedules set by it and the magistrate judge and had "vigorously litigated the suppression motion." (A 79). Further, the court pointed out that after it had issued its opinion denying Barro's suppression motion on July 29, 2013, it failed to set a status conference, a fact that neither party raised with the court prior to Barro's motion to dismiss the indictment. (A 71).

Moreover, the district court noted that, contrary to any suggestion of lack of diligence on the government's part, the prosecutor had spoken to defense counsel about various favorable changes to the Department of Justice's narcotics policies shortly after the court denied Barro's suppression motion, and defense counsel had represented that he would pass these along to Barro in an effort to restart plea negotiations. (A 71-72). Barro's counsel, however, never got back to the prosecutor; thus, it was only during the weekend of February 22-23, 2014, when preparing for a status conference scheduled for February 26, 2013, that the government realized the speedy trial clock had run. (A 72).

Notwithstanding these facts, Barro argues that the district court erred in its analysis by (1) requiring him to prove that the government had acted in bad faith; (2) crediting the government's speculation that it would have obtained an ends of justice exclusion if it had requested one; and (3) finding that the violation was isolated. (Br. 25-27). Barro, however, misconstrues the district court's analysis.

First, the district court did not, as Barro asserts, "blam[e]" defense counsel for "failing to 'come forward with any evidence' the government [had] acted in bad faith." (Br. 26). Rather, the court noted that Barro, himself, had not argued that the government had acted in bad faith or pointed to any pattern of neglect by the Office. (A 79). In fact, Barro had conceded that the delay resulted from "at worst neglect" by the government. (Id.).

Second, the district court did not, as Barro also contends, "excuse the delay based on the government's speculation that if it had asked for an ends of justice exclusion, it would have been granted." (Br. 26). Nor did the court attempt to apply the exclusion retroactively. (Id.). Instead, the district court simply noted that the violation resulted from the government's negligent failure to request an ends of justice exclusion on the basis of plea negotiations in

August 2013, which facts the defense did not contest. (A 72,
79). In fact, the court pointed out that Barro had conceded
that the violation "could likely have been avoided by the
prosecution's taking measures to procur[e] an ends of justice
exclusion." (A 77-78 (<u>citing</u> Barro's Mot. at 3)).[12]

Third, the district court's finding that the
government's failure to advise the district court of a potential
Speedy Trial Act violation was an isolated, unwitting violation
is correct even in light of the contemporaneous violation in
<u>United States v. Bert</u>. As Barro concedes, violations in two
cases do not show "a pattern of neglect" on the part of the
Office. (Br. 27). <u>See</u>, <u>e.g.</u>, <u>Giambrone</u>, 920 F.2d at 182
(finding a "pattern of neglect" on the part of the United States
Attorney's Office for the Western District of New York where the
Speedy Trial Act was violated in more than ten cases). Indeed,
the violation in <u>Bert</u> and the violation in this case were
isolated instances of government neglect based on uniquely
different circumstances. <u>Cf.</u> <u>Bert</u>, 2016 WL 493249, at *2 (the
government neglected to seek a speedy trial exclusion during the

---

[12] Barro also argues that "[t]he district court . . .
improperly decided that the lengthy delay was ameliorated by the
government's assertion that *had* it requested an ends of justice
exclusion, *then* the time would have been spent on plea
negotiations." (Br. 26.) There is no basis for this statement
in the record for this argument.

twelve months that the district court took to decide a suppression motion).

Barro nonetheless argues that these two violations suggest "that dismissal without prejudice was not sufficient to ensure the government would follow its speedy trial obligations." (Br. 27). To the contrary, the fact that the prosecutor in this case discovered the Speedy Trial Act violation and brought it to the attention of defense counsel and the district court just days after the defendant in <u>Bert</u> raised the violation in district court (Br. 26-27) clearly demonstrates that the <u>Bert</u> violation had a sufficiently powerful impact on other prosecutors in the Office. In other words, it did not require a dismissal with prejudice in <u>Bert</u> for other prosecutors to ensure that their Speedy Trial Act obligations were being met.

C.    The Impact Of Reprosecution On The
       Act And The Administration Of Justice

The district court also properly held that a dismissal of the indictment without prejudice would serve as a sufficient sanction against the government's violation of the Speedy Trial Act, and that precluding the government from reprosecuting Barro on serious drug charges because of the government's isolated unwitting violation would negatively impact the administration of justice. (A 80-81).

Here, the sanction of dismissal without prejudice imposed costs on the prosecution because it not only forced the government to re-indict Barro, but also forced it to run the risk that the grand jury would not return an indictment against him. Indeed, the greater harm surely would have come from a decision to dismiss the indictment with prejudice, thus permitting Barro to escape prosecution for his actions in a court of law.

Barro nevertheless criticizes the district court's decision, claiming that it (1) "discounted that this case was one of at least two with lengthy delays in the Eastern District of New York at the same time"; (2) "ignored that the prosecutor admitted that she only 'now' – when conceding the government's negligence – 'under[stood]' the government's obligation to enforce the Speedy Trial Act rules"; and (3) "overlooked the lack of any indication a dismissal without prejudice served as a deterrent given that the prosecutor cavalierly told the court how quickly the government would be able to re-indict Mr. Barro." (Br. 27-28). These arguments, however, mischaracterize the government's actions and the district court's decision.

First, even if the district court were unaware of the speedy trial violation in Bert, there is no reason that the Bert case should have changed the court's analysis. As discussed

above, two isolated violations do not make a pattern nor do they suggest a "truly neglectful" attitude. See, e.g., Giambrone, 920 F.2d at 182.

Second, Barro mischaracterizes the prosecutor's use of the word "now" at the May 14, 2014 hearing. (See A 63). Indeed, there is no evidence to suggest the prosecutor was claiming that she was unaware of her Speedy Trial Act obligations until the motion in the Bert case was filed. Instead, the prosecutor's statement appears to be a product of her description of the confluence of factors that led to her failure to request a Speedy Trial Act waiver in July or August 2013: the court's out-of-character failure to schedule a routine status conference after ruling on the suppression motion – a status conference at which the government might well have requested a Speedy Trial Act exclusion because of discussions about plea dispositions that arose in light of the issuance of the Holder Memorandum. (See A 63).[13] In fact, the prosecutor was making the point that she had learned her lesson and would not repeat her mistake.

---

[13]   As the prosecutor explained:  "By no means was this the government doesn't care about this case or the government doesn't think this is an important case.  It was more just a confluence of when the decision was issued and the fact that there wasn't automatically a status conference and that there were these ongoing changes with drug courier cases."  (A 64).

Third, Barro's contention that dismissal with prejudice was necessary because the prosecutor had opined that Barro "could be and he would be reindicted in short time" (A 65), thereby suggesting a "cavalier" attitude on the government's part (Br. 28), ignores the context of that statement: a specific response to the court's question of whether the government could re-indict Barro after a dismissal. Indeed, it is clear that the prosecutor simply wanted to assure the court that the government could and would move expeditiously to seek another indictment before a grand jury.

D.    The Prejudice To The Defendant

Finally, the district court properly found that Barro was not prejudiced by the five-month violation of the speedy trial clock when it found that Barro's trial preparation was not harmed by the delay and that he suffered no inordinate anxiety attributable to the delay.  Indeed, none of Barro's arguments to the contrary has any merit.

Barro first argues that the district court used the "wrong standard" when it concluded that prejudice is not "'generalized harm to the defendant,' but the 'effect of that delay on the defendant's trial preparation.'" (Br. 28-29 (quoting A 82)).  Barro asserts that, using the "correct standard," the prejudice he suffered was "precisely the type

discussed in <u>Taylor</u>: he had anxiety about the charges he was facing and apprehension about being separated from his family by deportation." (Br. 29).

Barro, however, mischaracterizes the district court's analysis. The court not only found that the delay in this case did not actually prejudice Barro's ability to mount a defense at trial – a fact that Barro did not dispute (A 82) – but also that Barro had not suffered any non-trial prejudice.[14] Indeed, as Barro concedes (Br. 29), the court found that Barro's anxiety about the charges he was facing and the risk of being deported and separated from his family were "real" concerns (A 82). But the court also appropriately found that Barro's anxiety was "hardly attributable to the additional delay." (<u>Id.</u>). To the contrary, Barro had been free on bond since April 2012, which allowed him to work and spend time with his family, including having a second child with his wife. (A 81). In addition, the delay did not drain Barro's resources because he was represented

---

[14] The district court properly analyzed non-trial prejudice in the context of the length of the delay because "[t]he longer the delay, the greater the presumptive or actual prejudice." (A 82) (quoting <u>Taylor</u>, 487 U.S. at 340). The court noted that the delay "may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." (A 82) (quoting <u>Taylor</u>, 487 U.S. at 340).

by the Federal Defenders.[15]  (Id.).  Finally, Barro's decision to renew plea negotiations after the Speedy Trial Act violation convinced the district court that Barro was in no hurry to have his case tried.  (A 82-83).  All of these reasons – not simply the last one – led the court to find that the delay did not cause non-trial prejudice to Barro.  (See Br. 29 (arguing that the district court "discounted" Barro's anxiety "simply because Mr. Barro's counsel renewed plea negotiations after the speedy trial violation was discovered) (emphasis added)).

Finally, the district court appropriately determined that the approximately five-month delay did not trigger a presumption of prejudice based on this Court's precedent. (A 82); see Bert, 2016 WL 493249, at *11 (ordering that the court on remand evaluate how the length of the delay "compared to delays, if any, in other cases").  Specifically, the court noted that the cases in which courts had found the length of the delay to weigh in favor of dismissal with prejudice had far longer periods of delay.  See Stayton, 791 F.2d at 21-22 (a non-excludable delay of 23 months); Mancuso, 302 F. Supp. 2d at 34 (a non-excludable delay of three years).

---

[15]    Furthermore, the six months Barro spent in state prison after his arrest in this case was not related to his federal indictment, but resulted from the fact that he had left the United States in violation of his state probation conditions.  (A 81).

\*     \*     \*

In sum, the district court properly considered all the statutory and common law factors and correctly determined that the indictment should be dismissed without prejudice.    Barro's Speedy Trial Act claim, therefore, should be denied and his conviction upheld.

POINT TWO

THE TRIAL COURT CORRECTLY FOUND THAT THE
GOVERNMENT'S RACE-NEUTRAL AND NATIONAL-ORIGIN-NEUTRAL
EXPLANATION FOR STRIKING JUROR 17 WAS NOT PRETEXTUAL

Barro also argues that this Court should reverse his conviction and order a new trial because the government purportedly struck a juror based on her national origin in violation of the Fourteenth Amendment, or, alternatively, its proffered justification for striking that juror was a pretext for racial discrimination. (Br. 30-41). Both contentions are unavailing.

I. Factual Background

On October 6, 2014, the parties appeared before Magistrate Judge Cheryl Pollak for jury selection. (A 16, Dkt. No. 28). Magistrate Judge Pollak selected the first 34 qualified jurors as the pool from which the final 12 jurors and two alternates would be selected, and provided Barro with ten peremptory challenges and the government with six. (GA 2).

A. Initial *Batson* Challenge

The government used three of its first five peremptory challenges to strike black women (Jurors 3, 18 and 17), and defense counsel argued that these strikes established a prima facie case of discrimination requiring the government to articulate race-neutral reasons for its strikes. (A 104-06).

Magistrate Judge Pollak noted that eight of the 34 qualified jurors were black women and then asked the government to provide the reasons for its challenges. (A 105-06). The government proffered various race-neutral explanations for its strikes (A 106-12), which the magistrate judge accepted (A 109-12).

    1.  <u>Juror 3</u>

    During <u>voir</u> <u>dire</u>, Juror 3 stated that her niece's husband had pled guilty to a charge of importing cocaine into the United States from Guyana. (A 85-87). When the court asked whether this fact would cause Juror 3 to favor the government or the defendant, Juror 3 responded, "I don't think so." (A 86). This equivocal response prompted the magistrate judge to state, "[Y]ou seem a little doubtful," to which statement Juror 3 responded, "Yeah. Yeah." (<u>Id.</u>). In response to the question of whether she might be "biased in favor of the defendant here," Juror 3 responded, "If the evidence shows that, you know – if there is relevant evidence, I cannot be in favor of the evidence." (<u>Id.</u>). Juror 3 then said that she "fe[lt] for" her niece's husband and that she believed he should have gone to trial. (A 86-87). She also stated that she and her niece lived together. (A 92).

    In response to Magistrate Judge Pollak's inquiry as to the nature of the government's challenges, the government stated

that its challenge to Juror 3 was based on the fact that the
juror lived with the niece whose husband had been convicted of
importing narcotics into the United States, and that this
conviction and his imprisonment had been very difficult for her
family. (A 106-07). The magistrate judge credited the
government's reasoning as follows:

> [W]hether or not the fact that [Juror 3] has
> a nephew who has been convicted of importing
> cocaine, which is the same crime alleged
> here, was not a basis for a cause for
> challenge. This is a peremptory . . .
> challenge, and I think it is a rational,
> nondiscriminatory reason. Had she been
> white with the same thing, I guess we would
> see whether or not that's the question.
>
> But I think that in this case, it's too
> close. It was on the line as far as I was
> concerned for a challenge for cause. So I
> credit the government's explanation for
> that.

(A 109).

    2.  <u>Juror 18</u>

Juror 18 stated during <u>voir</u> <u>dire</u> that she had served
on a jury in a criminal case and that the jury had reached a
verdict. (GA 3). When Magistrate Judge Pollak asked Juror 18
whether she remembered "the nature of the charges," the juror
responded in the affirmative; however, Juror 18 also advised the
magistrate judge that she could not tell the judge what they
were. (<u>Id.</u>). When Magistrate Judge Pollak stated, "[Y]ou can
tell me what he was charged with," Juror 18 replied, "[I]t was

gun possession." (Id.). Juror 18 subsequently answered several standard questions posed by the magistrate judge. (A 98-100).

In response to Magistrate Judge Pollak's request for the basis of the government's peremptory challenge to Juror 18, the government explained that it had chosen to strike her because, among other things, she had been "very loud," "outspoken," "animated," and "[s]arcastic." (A 107). Magistrate Judge Pollak agreed: "I, too, was concerned about [Juror 18's] responses to some of my questions. They almost seem disrespectful. And I'm concerned about what kind of a juror she might be." (A 109).

### 3. Juror 17

During voir dire, Juror 17 stated that, among other things, she had lived in Brooklyn for twenty years, her husband and her 33-year-old daughter lived with her, and her other two children lived in Jamaica. (A 96-97). When proffering an explanation for its strike of Juror 17, the government explained that, among other things, it had concerns because the juror had "connections to Jamaica," "two kids liv[ing] in Jamaica," the country from which the defendant had imported the cocaine. (A 106). The government also noted that Juror 17 had a 33-year-old child living with her in Brooklyn, i.e., a child close in age to the defendant. (Id.). The government further pointed

out that Juror 17 had "paused for a while" in responding to a question about her husband, which suggested possible memory issues.  (Id.).

Concerning the government's challenge to Juror 17, the defense stated that it believed the challenge was problematic because it was a proxy for race: "She's from Jamaica.  My client's from Jamaica.  I think that's almost part of her race." (A 108).  In response, Magistrate Judge Pollak stated:

> As for the Jamaica, I understand what you're arguing.  I don't know that -- the problem I guess is that being from Jamaica, she may very well be very familiar with the issues and the problems that confront people living there and coming to the United States.  And I don't see it as a racial thing.  It may be more of, you know, her country of origin.  But I don't know that that's a Batson basis.  And given the fact that I found the other two to be nondiscriminatory, I'm not going to find there's a Batson here.

(A 109-10).

### B.    Renewed *Batson* Challenge: Juror 24

When exercising its sixth and final peremptory challenge, the government struck Juror 24, a black woman who appeared to be in her thirties.  (A 114).  During voir dire, Juror 24 stated that she lived with her grandmother, had worked at a check-cashing business but had been unemployed for a year and a half, and spent her time looking for a job, watching

television (news and cartoons), sleeping, talking on the phone, and going out with friends.  (A 101-02).

The defense renewed its <u>Batson</u> objection to the government's peremptory strike, and the government responded that it was a factor in its decision that Juror 24 was the only person left on the panel who had been unemployed for a significant period of time.  (A 113).  The government stated that in looking for stable members of the community to serve as jurors, it had "concern about someone who is not pursuing education, who has been out of a job for a year and a half and has had . . . no gainful employment other than [a] check cashing job a year and a half ago.  It's not clear . . . what looking for a job necessarily means in this context."  (A 114).

Despite these reasons, Magistrate Judge Pollak found "a problem" with the government's response and sat Juror 24 on the jury.  (A 115).  The government then asked to withdraw its strike of Juror 24 in return for the magistrate judge's withdrawal of its finding of a <u>Batson</u> violation.  (A 118).  While defense counsel initially objected to the government's request, it ultimately consented.  (A 118-21).  Magistrate Judge Pollak then withdrew her finding as to Juror 24, to which action defense counsel again noted his assent.  (A 121).

II.  The Applicable Law

 A.  The *Batson* Ruling

  The Supreme Court has held that the government's use of peremptory challenges to strike potential jurors because of their race violates the Equal Protection Clause of the Fourteenth Amendment.  See Batson v. Kentucky, 476 U.S. 79 (1986).  The ruling in Batson has been extended to, among other things, peremptory challenges based on gender.  J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994); see also United States v. Martinez, 621 F.3d 101, 107-08 (2d Cir. 2010) (defendant may not make gender-based strikes).  Similarly, other cases have applied the strictures of Batson to challenges to other "cognizable groups."  See Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (plurality opinion) (Latinos); United States v. Gelb, 881 F.2d 1155, 1161 (2d Cir. 1989) (Jews); Roman v. Abrams, 822 F.2d 214, 227-28 (2d Cir. 1987) (whites).  This Court, however, has yet to decide "whether or when national origin discrimination is a cognizable group for Batson protection."  Rodriguez v. Shriver, 392 F.3d 505, 510-11 n.9 (2d Cir. 2004) (finding that reference to "Santo Domingo" was not a proxy for national origin discrimination).  Further, some courts of appeals have expressed doubts that Batson should be extended from its racial and gender context to cover such claims.  See

Rico v. Leftridge-Byrd, 340 F.3d 178, 182-83 (3d Cir. 2003)
(holding that the Third Circuit had not yet extended Batson to
national-origin claims, and that seven strikes of Italian-
American veniremen therefore could not be the basis for habeas
relief); United States v. Marino, 277 F.3d 11, 23 (1st Cir.
2002) (defendant did not show that Italian-Americans form a
distinctive group subject to Batson protection); Murchu v.
United States, 926 F.2d 50, 54 n.5 (1st Cir. 1991) (Americans of
Irish ancestry were not cognizable group for purposes of
defendant's claim that prosecutor's use of peremptory challenges
to exclude jurors with Irish surnames violated equal
protection)[16]; but see Pemberthy v. Beyer, 19 F.3d 857, 870 (3d
Cir. 1994) (stating in dicta that use of a peremptory challenge
on the basis of national origin would be objectionable); United
States v. Biaggi, 909 F.2d 662, 678-79 (2d Cir. 1990) (assuming,
without specifically ruling, that Italian-Americans constitute a
cognizable group).[17]

---

[16]   Footnote 5 of Murchu states that the court of appeals
had "previously assumed that the Batson formulation extends to
cognizable ethnic and national groups."

[17]   Also, in a pre-Batson decision, the Supreme Court
prohibited national origin discrimination.  Hernandez v. Texas,
347 U.S. 475, 479 (1954).

B.    Procedures Under *Batson*

Batson and its progeny outline a three-part process by which challenges to peremptory strikes are analyzed.    See Batson, 476 U.S. at 96-98.    First, the party alleging a discriminatory strike must make a prima facie showing that the other party has exercised peremptory challenges on the basis of race, gender or another cognizable factor.    If the requisite showing has been made, the burden then shifts to the non-moving party to articulate a neutral explanation for striking the jurors in question.    Finally, the presiding judge must determine whether the moving party has carried his or her burden of proving purposeful discrimination.    See, e.g., Hernandez v. New York, 500 U.S. at 358-59; United States v. Diaz, 176 F.3d 52, 76 (2d Cir. 1999).

With respect to the second step in the analysis, the Supreme Court has held that "[i]n evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law."    Hernandez, 500 U.S. at 359.    A "neutral" explanation means "an explanation based on something other than the race of the juror."    Id.    "At this [second] step of the inquiry, the issue is the facial validity of the [attorney's]

explanation.  Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral."  Id.; see also Purkett v. Elem., 514 U.S. 765, 767-68 (1995).  Furthermore, a neutral explanation need not be "persuasive, or even plausible" for the non-movant to meet his obligation and advance the inquiry to the third step.  Purkett v. Elem., 514 U.S. at 768.

With respect to the third step in the Batson analysis, "the movant must satisfy his or her burden of persuasion and prove intentional race discrimination."  Barnes v. Anderson, 202 F.3d 150, 156 (2d Cir. 1999).  Deciding whether a movant has met his burden "compels courts to determine the credibility of the proffered explanations."  Id. (internal citation and quotation marks omitted).

B.    The Standard Of Review

The presiding judge's evaluation of whether a proffered explanation is pretextual is reviewed for clear error and is entitled to "great deference."  Hernandez, 500 U.S. at 369; Barnes, 202 F.3d at 156; United States v. Franklyn, 157 F.3d 90, 97 (2d Cir. 1998).  This deference makes "particular sense" in the context of Batson challenges:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding largely will

turn on evaluation of credibility. In the
typical peremptory challenge inquiry, the
decisive question will be whether counsel's
race-neutral explanation for a peremptory
challenge should be believed. There will
seldom be much evidence bearing on that
issue, and the best evidence often will be
the demeanor of the attorney who exercises
the challenge. As with the state of mind of
a juror, evaluation of the prosecutor's
state of mind based on demeanor and
credibility lies peculiarly within a trial
judge's province.

Hernandez, 500 U.S. at 365 (internal citations and quotation

marks omitted); see also McKinney v. Artuz, 326 F.3d 87, 100-01

(2d Cir. 2003).

III. The Government's Explanation For Striking
     Juror 17 Was Not Inherently Discriminatory
     Under *Batson* Step Two

Barro argues that the government's explanation for

striking Juror 17 was inherently discriminatory because it was

"the equivalent of striking her because of her Jamaican national

origin." (Br. 32). Not only does this claim mischaracterize

Barro's argument below, but it completely ignores the

government's race-neutral and national-origin-neutral

justifications.

Indeed, as described above, Barro never raised a

national origin claim in the district court. His only complaint

with respect to the government's reference to Juror 17's

connections to Jamaica was that Jamaica was a proxy for race:

"She's from Jamaica. My client's from Jamaica. I think that's

almost part of her race." (A 108). Thus, Barro's claim is governed by plain error review. See Fed. R. Crim. P. 52(b). "Plain error" is (1) error, that (2) is plain, and (3) affects substantial rights. If all three conditions are met, an appellate court has the discretion to correct a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993); see also Johnson v. United States, 520 U.S. 461, 467 (1997); United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (en banc). Given that Barro concedes that this Court has not yet decided that national origin is a cognizable group for Batson purposes (Br. 35), any error cannot be plain.

In any event, despite Barro's claims to the contrary (see Br. 36 (stating incorrectly that "the government made no attempt to link [Juror 17's] Jamaican background to the case")), the basis for the government's strike was neither Juror 17's race nor her national origin. Rather, the government explained that it struck Juror 17 because she had "connections to Jamaica" – specifically, she had "two kids liv[ing] in Jamaica." (A 106). This raised two concerns for the government. First, Jamaica was the place from which the defendant had "import[ed] . . . cocaine." (Id.). Second, Barro was twenty-four years old

at the time of the jury selection (see GA 4) and, thus, likely similar in age to Juror 17's children, including the "33-year-old" child the government referenced in its explanation (A 106). See, e.g., United States v. Alvarado, 951 F.2d 22, 25 (2d Cir. 1991) (having children defendant's age may be permissible basis of peremptory challenge). Based on these concerns, the government reasonably believed that Juror 17 might not be an impartial juror.

Indeed, this Court's decision in Rodriguez, 392 F.3d at 508-11, provides support for the neutrality of the government's explanation in the instant case. In response to a challenge that he had unconstitutionally challenged Hispanics on the jury panel, the Rodriguez prosecutor explained: "As to [one male Hispanic juror], the fact that he is from Santo Domingo, I would submit based on my experience with a number of narcotics dealers who have been arrested while prosecuted from Santo Domingo — I feel he . . . might not be a fair and impartial juror." 392 F.3d at 508. On appeal, the defendant argued that the prosecutor's explanation was inherently discriminatory because it demonstrated that the prosecutor had challenged the juror "solely because of his national origin, and his Dominican homeland defined his ethnicity and his race." Id. at 510. This Court rejected that argument, however, specifically finding that

"translating the prosecutor's reference to a specific city into a general ethnicity requires a critical inferential step, and this mental leap suggests that the reason offered by the prosecutor may not be <u>inherently</u> discriminatory." <u>Id.</u> (emphasis in original).  Thus, the Court held that based on the prosecutor's explanation, along with his testimony and <u>voir</u> <u>dire</u> notes,

> the inference to be drawn is not that Santo Domingo was code for Latino, but rather that [the prosecutor] was concerned with indicia suggesting that [the juror] himself might have been involved in drug dealing, or potentially tolerant of it.  If accepted as true, then, this statement demonstrates that the decision to strike [the juror] was racially and ethnically neutral.

<u>Id.</u> at 511.

It is even clearer here than in <u>Rodriguez</u> that the government's explanation for its strike was not inherently discriminatory.  First, while in <u>Rodriguez</u> the prosecutor expressly based his explanation on "the fact that [the juror] [was] from Santo Domingo," the government in this case never claimed that its strike was based on Juror 17's being from Jamaica.  Rather, the government argued that its concerns about Juror 17's "connections to Jamaica" related to the fact that two of Juror 17's children lived in Jamaica, the country from which Barro had imported drugs.  Because there was no discriminatory intent inherent in the government's explanation, the magistrate

judge appropriately deemed it neutral. See Hernandez, 500 U.S. at 359.

Finally, Barro takes issue with the magistrate judge's "own explanation" as to why the government struck Juror 17, namely that Juror 17 "'may very well be very familiar with the issue and the problems that confront people living [in Jamaica] and coming to the United States.'" (Br. 37 (quoting A 109)). Barro asserts that the magistrate judge's explanation was "speculative" and did not make clear why Juror 17's experience would be relevant. (Br. 37).

Barro's assertions are baseless. The magistrate judge's statement that Juror 17 may be familiar with issues and problems in Jamaica is a reasonable conclusion to draw from the fact that Juror 17 had two children living in Jamaica and a 33-year-old child at home in Brooklyn. Regardless, it is the government's – not the trial court's – explanation that must be analyzed under Batson's second step.[18] See, e.g., Purkett v. Elem., 514 U.S. at 768 ("At this [second] step of the inquiry,

--------

[18] For the same reason, the magistrate judge's comment that "It may be more of, you know, [Juror 17's] country of origin[,] [b]ut I don't know that that's a Batson basis" (A 110), is not relevant to the analysis of whether the government proffered a neutral explanation for its strike. Similarly, the magistrate judge's failure to make a credibility finding as to national origin does not require remand. (See Br. 39 n. 6 (citing Galarza v. Keane, 252 F.3d 630, 633 (2d Cir. 2001)). This is especially true as Barro never even raised national origin as a basis for his Batson claim.

the issue is the facial validity of the prosecutor's explanation."). And for the reasons discussed above, the government's explanation was not facially discriminatory.[19]

IV.  The Trial Court's Finding That The Government's Race-Neutral And National-Origin-Neutral Explanation Was Not Pretextual Was Not Clear Error

The trial court found that the government's strike of Juror 17 was not intentionally discriminatory, (A 109-10), a finding that is reviewed for clear error and "accorded great deference on appeal." Hernandez, 500 U.S. at 364. This "great deference" makes "particular sense" in the context of peremptory challenge inquiries because "the decisive question will be whether counsel's race-neutral explanation . . . should be believed," id. at 365, and the "best evidence" bearing on this issue "often will be the demeanor of the attorney who exercises the challenge," which "lies peculiarly within a trial judge's province," id. (internal quotations omitted). Thus, in the absence of "exceptional circumstances," appellate courts defer to the trial court's factual findings. Id. at 366.

Barro nonetheless contends that the government's proffered justification for striking Juror 17 was a pretext for racial discrimination. (Br. 37 (citing United States v.

---

[19]    Barro also argues that there was not "any hint that [Juror 17] had any knowledge or experience with the Jamaican drug trade." (Br. 36). This is true but completely irrelevant given the other concerns the government raised about Juror 17.

Douglas, 525 F.3d 225, 238-40 (2d Cir. 2008) (noting that "[d]iscriminatory intent may be found to be inherent where the proffer of a supposedly race-neutral explanation has a racial ingredient")).[20]  Specifically, Barro argues that "[b]ecause 90% of challenges based on Jamaican origin will also challenge black jurors, [the government's] justification raises a plausible inference of discrimination." (Br. 38 (citing Hernandez, 500 U.S. at 363 (finding that the prosecutor's admission that his ground for excusing certain jurors related to their ability to speak and understand Spanish "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges")))).

Barro's argument is fundamentally flawed. It, again, rests on the false assumption that the government's proffered justification for striking Juror 17 was her national origin. But the government said no such thing. Rather, the government explained that it struck Juror 17 because she had two children living in Jamaica, the place from which Barro imported cocaine. It requires several inferential leaps from this explanation to reach the conclusion that the government purposefully

---

[20]  Notably, the Douglas Court never found that the prosecutor's strike of a juror born in Jamaica was race-based. Rather, it simply noted that the district court had stated that one of reasons given by the prosecutor – that the juror was from the same country as the defendant – was not neutral. See Douglas, 525 F.3d 240.

discriminated against black jurors. First, it requires one to infer from the government's explanation that the government struck Juror 17 based on her national origin. Second, it requires one to then infer that, because Jamaica has a 90% black population, the government purposefully discriminated against black jurors. Yet, the magistrate judge – after evaluating the demeanor and credibility of the government attorneys – did not find any evidence, let alone a plausible inference, of purposeful racial discrimination here. (A 109-10).

Furthermore, the government provided an additional valid, neutral reason that alone sufficed to strike Juror 17. Namely, the government stated that "when [Juror 17] was answering the question about what her husband used to do, she paused for a while and it seemed like she couldn't remember and then she said he was a taxi driver which made me question whether she has issues with memory." (A 106). Although the magistrate judge did not specifically address this reason, it is yet another valid, neutral justification for striking Juror 17. And because the government's primary justification – that Juror 17 had two children living in Jamaica – was not based on race or national origin, the "dual motivation" analysis Barro raises (Br. 39) does not apply. See, e.g., Douglas, 525 F.3d at 239 (explaining that "dual motivation" analysis applies where "a

prosecutor has articulated multiple reasons for his peremptory challenge, <u>one of which is race</u>") (emphasis added).

Finally, Barro argues that the validity of the government's justification was "further undercut by the fact that the government used three other peremptory challenges against black jurors, suggesting a pattern of discrimination." (Br. 39). Barro contends that the government offered "dubious explanations" for its strikes of other black jurors, and urges this Court to consider the "full context" in determining whether the strike of Juror 17 was discriminatory. (Br. 39-40).

Barro's arguments fail, particularly given the "full context" of jury selection in this case. As the magistrate judge noted, there were eight black women in the thirty-four member panel from which the jury was chosen. (A 105-06). Of the three black women jurors who were struck, Barro concedes that the government "provided valid, neutral justifications" for two of these jurors. (Br. 40). Namely, the government struck one of these two black jurors because her niece's husband had been convicted of importing drugs into the United States and the other because of her "animated" and "sarcastic" answers during <u>voir</u> <u>dire</u>. (A 106-07). And, as discussed above, the

government's strike of Juror 17 was for equally valid, neutral reasons.[21]

* * *

In sum, the magistrate judge correctly found that the government's race-neutral and national-origin-neutral explanation for striking Juror 17 was not pretextual and, therefore, Barro's <u>Batson</u> claim should be denied and his conviction affirmed.

---

[21] With respect to the fourth black female juror (Juror 24) whom the government initially struck but who was ultimately placed on the jury, the government continues to assert that its strike was not racially discriminatory and that the magistrate judge erred in sustaining a <u>Batson</u> challenge with respect to Juror 24. During <u>voir</u> <u>dire</u>, Juror 24 stated that she lived with her grandmother, had been unemployed for the last year and a half, worked at a check cashing business as her last job, and that her hobbies included watching television (including news and cartoons), sleeping, talking on the phone, and going out with friends. (A 101-02). The government provided a valid race-neutral explanation for striking Juror 24: namely, that Juror 24 was the only person left on the panel who had been unemployed for a year and a half, was not a student pursuing an education, and apparently had no gainful employment other than a check-cashing job a year and a half ago. (A 113-14).

<u>CONCLUSION</u>

For the reasons stated above, the judgment should be affirmed in all respects.

Dated:     Brooklyn, New York
          March 8, 2016

               Respectfully submitted,

               ROBERT L. CAPERS,
               <u>United States Attorney</u>,
               <u>Eastern District of New York</u>.

       By:            <u>       /s/         </u>
               PATRICK T. HEIN
               Assistant U.S. Attorney

JO ANN M. NAVICKAS,
PATRICK T. HEIN,
<u>Assistant United States Attorneys</u>,
    (<u>Of Counsel</u>).

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,419 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:  Brooklyn, New York
        March 8, 2016

                    _____/s/_____
                    JO ANN M. NAVICKAS
                    Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

                                                              Page

Jury Selection Transcript Excerpts,
  United States v. Sherman Barro, 14-CR-355 (ERK),
  Dated October 6, 2014......................................GA 1

Trial Exhibit,
  United States v. Sherman Barro, 14-CR-355 (ERK)...........GA 4

GA1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :  14-CR-355(CLP)
                            :
                            :
                            :
                            :
        -against-           :  United States Courthouse
                            :  Brooklyn, New York
                            :
                            :
                            :
SHERMAN BARRO,              :  Monday, October 6, 2014
        Defendant.          :  9:30 a.m.
                            :
                            :
- - - - - - - - - - - - - - -X

        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
        BEFORE THE HONORABLE CHERYL L. POLLAK
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

                    A P P E A R A N C E S :

For the Government:     LORETTA E. LYNCH, ESQ.
                        United States Attorney
                        Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                        BY:  UNA DEAN, ESQ.
                            PATRICK HEIN, ESQ.
                            Assistant United States
                            Attorneys


For the Defendant:      FEDERAL DEFENDERS OF NEW YORK
                        Attorneys for the Defendant -
                        SHERMAN BARRO
                            One Pierrepont Plaza, 16th Floor
                            Brooklyn, New York 11201
                        BY:  KANNAN SUNDARAM, ESQ.
                            DANIEL HABIB, ESQ.


Court Reporter:  Lisa Schwam, RPR, CRR, RMR
                 Official Court Reporter
                 Telephone: (718) 613-2268

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

GA2

5

1    -- for one thing, sometimes lawyers' estimates about how

2    long the case will be run a little short.  So I think that

3    it's safe to say that the case may be concluded in terms of

4    evidence by the end of the week or even in terms of the

5    presentation.  But since they will be deliberating I think

6    the jury should be available into at least the beginning

7    part of the following week.

8         THE COURT:  I guess if they tell us it's a

9    problem, we'll know, okay.

10        Okay.  Now, my understanding is that the Judge

11   wants us to select 12 jurors plus two alternates.  Is that

12   your understanding as well?

13        MS. DEAN:  It's our understanding, your Honor,

14   only from having spoken to your law clerk.

15        THE COURT:  All right.  Well, then -- that's what

16   we were told by Judge Reyes's courtroom person so I'm hoping

17   that's correct.  And I don't know whether you all have

18   selected a jury with me before.  I think you might have.

19   But basically, what we're going to do is we're going to seat

20   34 people.  The government gets six peremptories in the main

21   jury.  The defendant gets ten.  And then I'm giving you two

22   alternate peremptories each.  And the last six people,

23   probably in that row over there (indicating), will be the

24   alternates.

25        We'll do the main jury first, okay.  And I will

Case 15-2468, Document 37, 03/08/2016, 1722467, Page72 of 73

PROCEEDINGS                                          66

1        PROSPECTIVE JUROR:  I've served twice; both over

2   six years ago, both civil cases.  One was settled out of

3   court and the other one went to verdict.

4        THE COURT:  Okay.  And anything about either of

5   those two experiences that would make it difficult for you

6   to serve here?

7        PROSPECTIVE JUROR:  No.

8        THE COURT:  Okay.  And do you understand the

9   difference been the burdens of proof as I've just stated it?

10        PROSPECTIVE JUROR:  Yes.

11        THE COURT:  Anybody else in the back row?  Yes.

12   Is it Ms. Johnson?

13        PROSPECTIVE JUROR:  Yes.  I served in '95 and we

14   reached a verdict.

15        THE COURT:  Was it a criminal case or a civil

16   case?

17        PROSPECTIVE JUROR:  No, it was criminal.

18        THE COURT:  And do you remember the nature of the

19   charges?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  What was the person charged with?

22        PROSPECTIVE JUROR:  I can't tell you that.

23        THE COURT:  You can tell me what he was charged

24   with.

25        PROSPECTIVE JUROR:  It was gun possession.



OBSERVATIONS AND EXTENSIONS

**PASSPORT**
**PASSEPORT**
**PASAPORTE**

## JAMAICA

TYPE / TYPE / TIPO   COUNTRY CODE / CODE DU PAYS / CODIGO DEL PAIS   PASSPORT N°. / N°. DU PASSEPORT / No. DE PASAPORTE

**JAM**

SURNAME / NOM / APELLIDOS

**BARRO**

GIVEN NAMES / PRÉNOMS / NOMBRES

**SHERMAN ORANDE**

NATIONALITY / NATIONALITÉ / NACIONALIDAD

**JAMAICAN**

OCCUPATION / FONCTION / OCUPACION

**STUDENT**

DATE OF BIRTH / DATE DE NAISSANCE / FECHA DE NACIMIENTO

**18**     **1990**

SEX / SEXE / SEXO

**M**

PLACE OF BIRTH / LIEU DE NAISSANCE / LUGAR DE NACIMIENTO

PLACE OF ISSUE / LIEU D'ÉMISSION / LUGAR DE EMISION

DATE OF ISSUE / DATE DE DÉLIVRANCE / FECHA DE EMISION

SIGNATURE OF BEARER / SIGNATURE DU DETENTEUR / FIRMA DEL TITULAR

DATE OF EXPIRY / DATE D'EXPIRATION / FECHA DE VENCIMIENTO

SB 00000056