# 15-2468-cr

To be argued by:
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit
_____
Docket No. 15-2468-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

SHERMAN BARRO,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

REPLY BRIEF FOR DEFENDANT-APPELLANT SHERMAN BARRO

_____

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742
Attorney for Defendant-Appellant
 *Sherman Barro*

ALLEGRA GLASHAUSSER,
 *Of Counsel*

# Table of Contents

Preliminary Statement ....................................................................................1

Introduction ...................................................................................................1

Argument

    Point 1

    Because the district court failed to properly assess the seriousness
    of the speedy trial delay in appellant's case or whether there was a
    pattern of delays in the district, this Court should reverse the
    decision dismissing his indictment without prejudice .................... 2

        A.     The amended decision in *United States v. Bert*, remanding for
            the district court to take into account factors supporting a
            dismissal with prejudice ......................................................... 3

        B.     The district court failed to properly consider the seriousness
            of the seven-and-a-half-month delay ...................................5

        C.     As in *Bert*, the district court failed to consider other Eastern
            District speedy trial delays ...................................................... 9

    Point II

    The government's challenge of a black juror because of her
    Jamaican background was discriminatory under *Batson v. Kentucky*
    ........................................................................................... 11

        A.     This Court should reject the government's argument that
            national origin is not a *Batson* protected class .................... 12

        B.     The government's strike of Ms. Martin was inherently
            discriminatory under *Batson* step two. ................................. 14

        C.     Alternatively, the government's strike of Ms. Martin because
            of her connections to Jamaica was a proxy for race-based
            discrimination ....................................................................... 18

D.    This error is preserved ........................................................... 19

Conclusion.............................................................................................. 21

# Table of Authorities

<u>Cases</u>

*Batson v. Kentucky,*
476 U.S. 79 (1986) ................................................................................. 2, 12

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ..................................................................................... 12

*Hernandez v. New York,*
500 U.S. 352 (1991) ..................................................................................... 18

*Hernandez v. Texas,*
347 U.S. 475 (1954) ..................................................................................... 12

*McCleskey v. Kemp,*
481 U.S. 279 (1987) ..................................................................................... 20

*Murchu v. United States,*
926 F.2d 50 (1st Cir. 1991) ......................................................................... 14

*Rico v. Leftridge-Byrd,*
340 F.3d 178 (3d Cir. 2003) ................................................................. 13, 14

*Rodriguez v. Schriver,*
392 F.3d 505 (2d Cir. 2004) ................................................................. 13, 17

*Tankleff v. Senkowski,*
135 F.3d 235 (2d Cir. 1998) ....................................................................... 20

*United States v. Alvarado,*
951 F.2d 22 (2d Cir. 1991) ......................................................................... 16

*United States v. Bert,*
No. 14-2428-CR, 2016 WL 493249 (2d Cir. Feb. 9, 2016) ............................. 2, 4, 5

*United States v. Brown,*
352 F.3d 654 (2d Cir. 2003) ................................................................. 12, 20

*United States v. Hicks,*
No. 07-CR-00184-WYD, 2015 WL 4162785 (D. Colo. July 10, 2015) .................. 7

*United States v. Marino,*
277 F.3d 11 (1st Cir. 2002) ......................................................................... 14

iii

*United States v. Tunnessen*,
    763 F.2d 74, 79 (2d Cir. 1985).................................................................... 4

*United States v. Ward*,
    No. 13-CR-40066-01-DDC, 2015 WL 1959631 (D. Kan. Apr. 29, 2015) ............. 8

*Vill. of Freeport v. Barrella*,
    No. 14-2270-CV, 2016 WL 611877 (2d Cir. Feb. 16, 2016) ................................... 13

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

Docket No. 15-2468-cr
_____

UNITED STATES OF AMERICA,
Appellee,

-against-

SHERMAN BARRO,

Defendant-Appellant.
_____
APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

REPLY BRIEF FOR DEFENDANT-APPELLANT SHERMAN BARRO
_____

**Preliminary Statement**

This brief is submitted in reply to the government's brief, which was filed on March 8, 2016. Appellant's main brief was filed on December 8, 2015.

**Introduction**

1.The government does not dispute that about seven and a half consecutive months of non-excludable delay – five months more than the 70 days allowed under the Speedy Trial Act – passed before Mr. Barro's case was dismissed without prejudice for

1

a violation of his right to a speedy trial. The lower court's decision to dismiss without prejudice, however, did not properly weigh the seriousness of this delay against the other Speedy Trial Act factors and did not consider whether Mr. Barro's case was part of a pattern in the Eastern District of New York, as *United States v. Bert*, No. 14-2428-CR, 2016 WL 493249 (2d Cir. Feb. 9, 2016), requires. For the reasons below and in Mr. Barro's main brief, this Court should, therefore, reverse Mr. Barro's conviction and dismiss the indictment with prejudice.

2.The government also argues that its use of a peremptory strike of a black juror because of her Jamaican background was non-discriminatory. For the reasons below and in Mr. Barro's main brief, this Court should find that this strike was based on national origin or race, reverse Mr. Barro's conviction, and remand his case for a new trial. *See Batson v. Kentucky*, 476 U.S. 79 (1986); U.S. Const. Amend. XIV.

## Argument

### Point I

> Because the district court failed to properly assess the seriousness of the speedy trial delay in appellant's case or whether there was a pattern of delays in the district, this Court should reverse the decision dismissing his indictment without prejudice.

There is still no dispute that Mr. Barro's case was delayed by seven and a half months of inaction after the court issued a decision in his suppression motion. In Mr. Barro's main brief he argued that because of this seven-and-a-half-month delay his indictment should have been dismissed *with* prejudice, particularly because the speedy

2

trial violation in Mr. Barro's case was discovered just days after a speedy trial violation was discovered in *United States v. Bert*, another case out of the Eastern District of New York. In response, the government argues that the delay in Mr. Barro's case was merely an "unwitting" violation and that the lower court's opinion was not an abuse of discretion.

Because the lower court failed to properly balance the seriousness of the delay against the other factors and failed to consider other Speedy Trial Act violations to assess whether there was a pattern of delay in the Eastern District, this Court should reject the government's arguments. Instead, it should reverse Mr. Barro's conviction, and find that the district court abused its discretion in failing to dismiss his indictment with prejudice. Alternatively this Court should reverse Mr. Barro's conviction and remand for the district court to reconsider its speedy trial decision after analyzing the factors that it failed to properly assess originally.

A.     The amended decision in *United States v. Bert*, remanding for the district court to take into account factors supporting a dismissal with prejudice.

In his main brief, Mr. Barro argued that the lower court failed to properly take into account the factors supporting a dismissal of the indictment with prejudice, in particular because this Court had recently held in *United States v. Bert* that a violation that occurred at the same time as the violation here should have resulted in a dismissal with prejudice. Since Mr. Barro submitted his main brief, this Court issued an amended decision in *Bert*, remanding for the district court to provide further analysis

3

about whether to dismiss the indictment with or without prejudice. *United States v. Bert*, No. 14-2428-CR, 2016 WL 493249, at *10 (2d Cir. Feb. 9, 2016). Far from undercutting Mr. Barro's arguments in his main brief, the amended decision in *Bert* reaffirms the problems with the district court's decision in his case.

In the amended *Bert* decision, this Court faulted the lower court for failing to analyze whether the delay was part of a "pattern of delay on the part of either the government or the court in the Eastern District of New York," how the severity of the delay in *Bert* compared to delay in other cases in the district, the "likelihood of repeated violations," and whether there were any "potential administrative changes prompted by [the] violation." *Bert*, 2016 WL 493249, at *10. The Court also criticized the district court for failing to "fully analyze[ ] the length of the delay" and "how the length of the delay affected the weight it attributed to the 'facts and circumstances' factor." *Id.* at *11. The Court reiterated that the absence of "bad faith, intentional delay, or some other form of heightened scienter" is not dispositive. *Id.* Finally, this Court faulted the lower court for discounting the prejudice suffered by Bert based on his failure to "promptly" alert the court that his speedy trial clock had expired because he had "no obligation to take affirmative steps to insure that he would be tried in a timely manner." *Id.* at *7 (citing *United States v. Tunnessen*, 763 F.2d 74, 79 (2d Cir.1985)).

All of these same issues from *Bert* are present here: the court did not properly consider the length of the delay, faulted counsel for failing to show more than a

4

negligent violation, and did not analyze whether there were additional examples of speedy trial violations in the district. *See* App. Br. 23-29.

B.    The district court failed to properly consider the seriousness of the seven-and-a-half-month delay.

In his main brief, Mr. Barro argued that the district court failed to properly weigh the seriousness of the over seven-month delay against the other Speedy Trial Act factors. The court made only a passing mention about the seriousness of the delay, stating that it was "more than a trifle" but "not a serious delay in the order of years." A. 82. In the revised version of *Bert*, this Court reiterated that the length of the delay is an important factor that the lower court must assess. *Bert*, 2016 WL 493249, at *6 (explaining that the length of the delay is a component of both the "facts and circumstances" factor and the "prejudice" factor and "that the underlying offense is serious may be outweighed by the other factors, and the length of the delay may contribute to such a counterweight.").

Nothing in the government's brief rebuts the conclusion that the court's fleeting reference to the length of delay here did not properly take the seriousness of the violation into account. Gov. Br. 26-27 (arguing only that delay should not be considered as a "stand alone" factor). This Court should, therefore, find that the district court improperly discounted the lengthy delay and that, when properly considered, this delay weighs in favor of dismissal with prejudice. App. Br. 22, 25.

In weighing the length of the delay against the other circumstances, this Court should reject the government's argument that plea negotiations excuse the delay, reexamine the government's claim that drug crimes should necessarily be classified as serious under the Speedy Trial Act, and consider that the trial prosecutor did not appear to view dismissal of the indictment without prejudice as a severe sanction.

      i.     This Court should reject the government's argument that defense counsel is to blame for the delay because he did not continue with plea negotiations.

This Court should reject the government's suggestion that defense counsel is to blame for the delay because he did not accept the government's offer to resume plea negotiations, or that the delay should be excused because it was due to the government's failure to request an exclusion based on plea negotiations. Gov. Br. 29-31. The government asserts that, "contrary to any suggestion of lack of diligence on the government's part," the government had spoken to defense counsel about new policies "shortly after the court denied" the motion, hoping to "restart plea negotiations," and counsel said he would "pass these along to Barro," but "never got back to the prosecutor." Gov. Br. 29. Counsel, however, had no duty to resume plea negotiations with the government or inform the government what Mr. Barro thought about the new policy changes. After this one conversation, seven and a half months passed without any action in Mr. Barro's case. This was not defense counsel's fault.

Similarly, this Court should also reject the government's renewed excuse for the delay because it was due simply to the "government's negligent failure to request an

ends of justice exclusion on the basis of plea negotiations." Gov. Br. 30-31, 34. The government has never asserted that plea negotiations were on-going for seven and a half months, only that "*had* the government obtained the appropriate interests-of-justice exclusion after the Court ruled on the suppression motion, the time that has passed *likely would have been* spent on plea negotiations." A. 40 (emphasis added). There is no indication, therefore, that plea negotiations were actually ongoing between August 2013 and February 2014 such that an ends of justice exclusion would have been appropriate.

> ii.     This Court should reconsider the seriousness of low-level, non-violent drug charges.

As argued in Mr. Barro's main brief, this Court should reconsider whether non-violent, low-level drug offenses should still be considered serious under the Speedy Trial Act in light of the government's own policy that these types of crimes are no longer serious. App. Br. 23-25. The government responds that "courts have continued" to regard drug charges as "serious," but neither of the two district court cases cited by the government address whether the traditional view should be reconsidered. Gov. Br. 24 (citing *United States v. Hicks*, No. 07-CR-00184-WYD, 2015 WL 4162785, at *2 (D. Colo. July 10, 2015) (stating that felony drug charges have "generally" been treated as serious under the Speedy Trial Act); *United States v. Ward*, No. 13-CR-40066-01-DDC, 2015 WL 1959631, at *3 (D. Kan. Apr. 29, 2015) ("Although the government only alleges that Mr. Ward possessed a relatively small

quantity of cocaine, his possession of a firearm in connection with narcotics distribution increases the seriousness of the crime")). Neither of these two cases undercuts Mr. Barro's argument that this Court should reexamine how serious Mr. Barro's charges were in light of the government's own assessment that non-violent, low-level drug offenses are not serious.

    iii.    This Court should take into account that the prosecutor did not appear to view the sanction of dismissal without prejudice as significant.

Finally, this Court should not ignore the prosecutor's cavalier attitude towards the speedy trial violation and the ease of reindictment. The government calls it a "mischaracteriz[ation]" that the prosecutor was "unaware" of her speedy trial obligations. Gov. Br. 34. But the prosecutor told the court that she did not "fault the Court," but that it had "never happened to [her] before" that a "status conference wasn't set," adding that she "now underst[oo]d the obligation of everyone to enforce the speedy trial." A. 63. The only logical implication from this comment is that until then, the prosecutor did not realize that when the court failed to set another date that the government had an obligation to do so or move to exclude the time.

Additionally, the trial prosecutor clearly did not share the concern the government raises in its brief that there was a "risk that the grand jury would not return an indictment against" Mr. Barro. Gov. Br. 33. On the contrary, the prosecutor assured the court that Mr. Barro "could and [ ] *would* be reindicted in short time." A. 65 (emphasis added). That the prosecutor had not previously understood the

8

government's obligation to enforce the defendant's speedy trial rights and that she had no concerns with reindicting Mr. Barro in short order suggested that a more severe sanction was necessary than dismissal without prejudice.

This Court should, therefore, conclude that the seriousness of the delay, when properly weighed against the other factors supports a dismissal with prejudice.

C.   As in *Bert*, the district court failed to consider other Eastern District speedy trial delays.

The government completely dismisses the relevance of *Bert*, asserting that *Bert* raised a "uniquely different circumstance[ ]," Gov. Br. 31, and that there is "no reason that the *Bert* case should have changed the court's analysis" because "two isolated violations" is not a pattern. Gov. Br. 33-34. But these violations were not unique: both cases involved clear Speedy Trial Act violations with lengthy delays; in both cases the prosecutors did not alert the court to the violations; and both violations were discovered within days of each other.

Despite these obvious similarities, based on the record, there is no indication that the district court or defense counsel were even aware of the violation in *Bert*, and the fact that there were two lengthy violations at the same time did not factor into the court's decision. Instead, the court faulted defense counsel for failing to "point to any pattern of neglect" and accepted the government's assertion that the violation was "isolated." A. 78-79. As in *Bert*, in Mr. Barro's case the district court did not analyze whether there were additional examples of speedy trial violations in the district. Just as

9

in *Bert*, this failure supports, at the least, a remand to the district court for further consideration, including an analysis of whether the violation in Mr. Barro's case was part of a pattern of violations in the Eastern District of New York.

***

Contrary to the government's current contention, that the discovery of the violation in Mr. Barro's case may have been prompted by the discovery of the violation in Bert's case does not "clearly demonstrate[ ]" that the *Bert* violation had a "sufficiently powerful impact on the prosecutors" that dismissal with prejudice is unwarranted. Gov. Br. 32. It does not show that administrative changes were made or that there were no other similar delays at the same time. Instead, it just demonstrates that there were at least two cases in the Eastern District of New York that were inactive for the same period of many months. As in Bert's case, because the district court here did not properly assess the seriousness of the delay and the potential pattern of delays, this Court should vacate Mr. Barro's conviction and either dismiss the indictment with prejudice or remand to the district court for further consideration.

**Point II**

The government's challenge of a black juror because of her
Jamaican origin was discriminatory under *Batson v. Kentucky*.

In his main brief, Mr. Barro argued that the government's challenge of Recie

Martin, a black juror who had lived in Brooklyn for 20 years, because of her Jamaican

background was either a discriminatory challenge on the basis of her national origin or

a discriminatory use of her national origin as a proxy for her race.[1] In response, the

government asserts that the trial prosecutors' explanation of the challenge as based on

Ms. Martin's "connections to Jamaica" was facially neutral because the prosecutors

also said that she had two children living in Jamaica and a 33-year-old son living in

Brooklyn, and because Mr. Barro was accused of importing cocaine from Jamaica.

The government also claims that the full context of the jury selection supports that

the prosecutors' explanations were neutral. Finally, the government argues that the

*Batson* challenge is unpreserved. Gov. Br. 45-58.

Because the trial prosecutors articulated no link between Ms. Martin's national

origin and the case, and the full context of jury selection included that the government

exercised four of its six peremptory strikes against black jurors, this Court should

reject the government's arguments. Further, these issues were fully preserved by

---

[1] The government refers to the jurors by number: Juror 3 is Ms. Waldron, Juror 17 is Ms. Martin, and Juror 18 is Ms. Johnson. For consistency with appellant's main brief and to avoid confusion, appellant will continue to refer to these jurors by name.

defense counsel's specific objection that a challenge based on Ms. Martin's Jamaican background was not neutral. This Court should, therefore, hold that the strike of Ms. Martin was discriminatory, reverse Mr. Barro's conviction, and order a new trial.

A.  This Court should reject the government's argument that national origin is not a *Batson* protected class.

As a preliminary matter, this Court should reject the government's claim that national origin discrimination is not prohibited in jury selection.[2] Gov. Br. 45-46, 50. The basic premise of *Batson* is that the defendant has a right to be tried by a "jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). *Batson* is not limited to discrimination on the basis of race, but prohibits discrimination based on "any other classification receiving heightened or strict scrutiny under" the Equal Protection Clause. *United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003). As the government concedes, even before *Batson* was decided, the Supreme Court prohibited national origin discrimination in jury selection, *Hernandez v. Texas*, 347 U.S. 475, 479 (1954); Gov. Br. 46, n. 17, and national origin is indisputably a protected class subject to strict scrutiny review. *E.g. Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The only possible conclusion is that national origin discrimination is prohibited by *Batson*.

---

[2] This Court reviews the lower court's *Batson* determinations *de novo* for steps one and two, whether a challenge against a particular group is unconstitutional and whether the prosecutor offered a neutral justification for the strike. App. Br. 32.

Despite this, the government asserts that "courts of appeals have expressed doubts" whether *Batson* "should be extended from its racial and gender context to cover" national origin. Gov. Br. 45-46. It is true that courts sometimes struggle with a linguistic confusion regarding the differences and overlap between "race," "ethnicity," and "national origin." *See, e.g.*, *Vill. of Freeport v. Barrella*, No. 14-2270-CV, 2016 WL 611877, at *3 (2d Cir. Feb. 16, 2016) (noting that in § 1981 context, the Supreme Court defined "racial discrimination," as including discrimination based on "ancestry or ethnic characteristics," and discussing possible overlap between race, ethnicity, and national origin); *Rodriguez v. Schriver*, 392 F.3d 505, 510 (2d Cir. 2004) (discussing whether challenge was based on juror's Dominican national origin or Latino ethnicity); *Rico v. Leftridge-Byrd*, 340 F.3d 178, 183 (3d Cir. 2003) ("What, though, does "ethnicity" or "ethnic origin" mean . . . how does one define "race" when the understanding of "race" itself has changed over the centuries?"). But courts have not struggled in concluding that *Batson* prevents discrimination based on a juror's membership in a protected class subject to strict scrutiny, a category which includes national origin. *See* App. Br. 33-35. *See also Rico*, 340 F.3d at 183-84 (noting that courts "quickly learned to avoid having to determine" "when and where to draw the line" but just "simply assumed without deciding that Batson has applicability to racial or ethnic groups other than black Americans").

None of the cases cited by the government support its proposition that *Batson* has "not yet extended" "to national-origin claims." Gov. Br. 46. On the contrary, in

*Rico*, 340 F.3d at 182-84, the Third Circuit concluded that a state court acting in 1992 did not "unreasonably" apply Supreme Court precedent when it concluded that *Batson* applied to a challenge against Italian-American jurors. And, the government's citation to two First Circuit cases in which the court rejected challenges that were based on the surnames of jurors indicating membership in a particular ethnic group fare no better. *United States v. Marino*, 277 F.3d 11, 23 (1st Cir. 2002) (rejecting Batson challenge based on individual's Italian surnames because the government "did not show that the challenged jurors were in fact Italian-Americans or even that all their surnames were Italian-American"); *accord Murchu v. United States*, 926 F.2d 50, 55 (1st Cir. 1991) (rejecting challenge based on Irish-American surnames). Here, the government's challenge was not based on speculation about Ms. Martin's national origin based on her name and there was no factual question that Ms. Martin was from Jamaica.

Because the government cites no cases suggesting national origin is not covered by *Batson* and offers no rational why national origin would not be covered, this Court should leave no room for further confusion and explicitly hold that national origin discrimination is prohibited by *Batson*.

B.     The government's strike of Ms. Martin was inherently discriminatory under *Batson* step two.

In response to Mr. Barro's argument that the government's challenge of Ms. Martin based on her "connections to Jamaica" was facially discriminatory under *Batson*

14

step two, the government provides three possible explanations why Ms. Martin's Jamaican background was a neutral reason for a strike: 1. Ms. Martin had "two children living in Jamaica," Gov. Br. 55; 2. Mr. Barro, who was 24 years old at the time of trial, was "likely similar in age to [Ms. Martin's] children, including the 33-year-old child the government referenced in its explanation," Gov. Br. 50-51; and, 3. Jamaica was the place from which the defendant had imported cocaine." Gov. Br. 50, 55. Because none of these three reasons dispel the inherently discriminatory strike of Ms. Martin because of her Jamaican background, this Court should reject the government's arguments to the contrary.

      1. Ms. Martin had "two children living in Jamaica"

First, the government says that that the "primary justification" for the strike was the prosecutor's comment that Ms. Martin had "two kids [who] live in Jamaica." Gov. Br. 56. The record, however, does not support that this reason was "primary," and, in any event, that Ms. Martin had children who lived in Jamaica was directly related to Ms. Martin's Jamaican background. Striking a juror for a characteristic directly related to national origin – here that her children lived in the country of her origin – is not distinct from striking a juror based on her own national origin. Absent any explanation why Ms. Martin's Jamaican children were relevant to her fitness as a juror, the bare fact that she had Jamaican children was not a neutral justification.

15

2. Ms. Martin had a "33-year-old son"

Second, the government asserts that the prosecutor offered a neutral reason for striking Ms. Martin based on her having a "child close in age to the defendant." Gov. Br. 50-51. But the trial prosecutor did not say that she struck Ms. Martin because her 33-year-old son was close in age to Mr. Barro; all the prosecutor said was that Ms. Martin "has a 33-year-old son." A. 106. Given that Mr. Barro, who, at 24 years old, was almost a decade younger than Ms. Martin's child, this Court should reject the government's current speculation that Ms. Martin's son's age was a neutral basis for the strike.

Additionally, *United States v. Alvarado*, 951 F.2d 22, 24-26 (2d Cir. 1991), the one case the government cites in support of its proposition that the prosecutor's unexplained comment that Ms. Martin had a 33-year-old child was neutral, Gov. Br. 51, is far from a ringing endorsement of this type of explanation. On the contrary, in *Alvarado*, this Court called the prosecutor's justification for a peremptory challenge that, because the juror had "children the age of the defendant, she might be unduly sympathetic," "dubious." *Id.* Given that, unlike the *Alvarado* prosecutor, the prosecutor here did not even attempt to link the son's age and Mr. Barro's case, *Alvarado* provides no support for the government's argument that the son's age was a neutral justification.[3]

---

[3] This Court should also reject the government's related assertion that it was "reasonable" for the trial court to conclude that Ms. Martin might be "familiar" with the "problems that confront" people immigrating to the United States from Jamaica because she had children in Jamaica and

16

> 3. Jamaica is the "place from which the defendant had imported cocaine"

Third, the government states that the prosecutor's comment that Jamaica was the "place from which the defendant had imported cocaine" was neutral, citing this Court's decision in *Rodriguez*, 392 F.3d 505. Gov. Br. 50-51. In *Rodriguez*, this Court rejected defense counsel's assertion that the prosecutor's mention of the city of "Santo Domingo" was "code for Latino" because the prosecutor explicitly linked the juror's background growing up in Santo Domingo with the crime charged, saying that the juror had potentially been "involved in drug dealing, or potentially tolerant of it" and "based on [the prosecutor's] experience with a number of narcotics dealers who have been arrested and prosecuted in Santo Domingo" the juror might not be fair. *Rodriguez*, 392 F.3d at 511. The government now says that it is "true but completely irrelevant" that Ms. Martin had no knowledge or experience with the drug trade. Gov. Br. 54, n. 19. But, it is this lack of any asserted link between Ms. Martin's national origin and any knowledge or information about the charged crimes that distinguishes this case from *Rodriguez*. Here, the government did not elaborate at all why Ms. Martin's Jamaican origin was related to any potential problem with her service as a juror.

---

Brooklyn. A. 109, Gov. Br. 52-53. There was no indication that any of these children had recently moved from Jamaica to the United States, nor was there any indication that Ms. Martin – who had lived in Brooklyn for 20 years – had done so.

Because the government does not explain how any of these three factors dispel the inherent discrimination in basing a strike of Ms. Martin on her Jamaica background, this Court should find that the government failed to meet their burden at *Batson* step two. *See Hernandez v. New York*, 500 U.S. 352, 361 (1991) (reason is not race-neutral if there is a "discriminatory intent" "inherent" in the explanation).

C.    <u>Alternatively, the government's strike of Ms. Martin because of her connections to Jamaica was a proxy for race-based discrimination</u>.

In response to Mr. Barro's alternative argument that striking Ms. Martin based on her "connections to Jamaica" was a proxy for racial discrimination, the government refuses to admit any possibility that this explanation had any national origin or racial ingredient. Gov. Br. 55-56. Instead, their answer on this point is simply that, based on the "full context" of jury selection, the judge below did not find an inference of racial discrimination, so this Court should not either. Gov. Br. 54-57.

The full context of jury selection, however, only supports Mr. Barro's position because Ms. Martin was not an isolated strike; the government used four of their six peremptory strikes against black woman. A. 106. The only context the government points to for support is that there were eight black woman on a 34 member panel and the court found that it provided sufficiently neutral reasons for its strikes of two other black woman. Gov. Br. 57. Neither of these facts are persuasive. First, the government provides no explanation why the fact that there were eight black woman on the panel supports their position.

18

Second, the government completely ignores important details about the context of its strikes of two other black women. Gov. Br. 40-42. Notably, in addition to the reasons the court found valid, the prosecutor also offered highly dubious reasons for those two challenges, stating that both Ms. Waldron and Ms. Johnson were not "entrenched [ ] in the community." A. 107-08. Specifically, Ms. Waldron was not "entrenched in the community, stable enough, to serve as a juror." A. 107. Ms. Waldron was, however, a 12-year Brooklyn resident who owned her home where she lived with her niece. A. 92-93. Similarly, the prosecutors had "reservations" about whether Ms. Johnson was "entrenched enough in the community" or had "stable ties to the community to be able to serve on this jury" because she was "not married, although she is engaged." A. 107-08. Ms. Johnson had lived in Brooklyn for two decades. A. 98-99. The government has completely omitted these comments from its recitation of the facts. Gov. Br. 40-42. As defense counsel argued below, the validity of any of the government's purportedly neutral explanations was undercut by these additional suspicious explanations that suggested a pattern of discrimination.

This context, therefore, does not undercut the conclusion that the strike of Ms. Martin based on her "connections to Jamaica" was a proxy for her race.

D.    This error is preserved.

Finally, the government claims that the *Batson* challenge here is unpreserved, asserting that Mr. Barro "never raised a national origin claim in the district court." Gov. Br. 49. This is not true. Defense counsel objected to the challenge of Ms. Martin

based on her being "from Jamaica or her family is from Jamaica," adding that the fact

that she was "from Jamaica," she just "happens to be from Jamaica," and she is "black

from Jamaica" is "not a reason" for a strike. A. 108. Counsel told the court that being

from Jamaica is "almost part of her race" and was a "problematic race-neutral

explanation." A. 108. This specific objection was more than sufficient to preserve

both a national-origin and race-based challenge to the strike. The lower court

recognized both possibilities, stating that it did not see the government's challenge as

a "racial thing" and "[i]t may be more of, you know, her country of origin." A. 109-10.

The lower court was, therefore, "clearly apprised of the possibility of error and had

disagreed, or had been given an opportunity to correct the error and had declined to

do so." *United States v. Brown*, 352 F.3d 654, 662-63 (2d Cir. 2003) (citation omitted).

Because this error is preserved, this Court should also reject the government's

assertion that this Court should review only for plain error.[4]

 If this Court finds that the prosecutor struck Ms. Martin for discriminatory

reasons, reversal is required, without application of harmless error analysis. *E.g.*,

*Tankleff v. Senkowski*, 135 F.3d 235, 240 (2d Cir. 1998) ("exclusion of jurors on the

basis of race is a structural error that can never be harmless"). *See McCleskey v. Kemp*,

---

[4] Even under plain error review, the government's unsupported assertion that "any error cannot be plain" because Mr. Barro "concedes that this Court has not yet decided that national origin is a cognizable group," Gov. Br. 50, is wrong. This Court need not have explicitly stated that national-origin is a protected class under *Batson* for it to be plain error to strike a juror based on that juror's national origin. *See Brown*, 352 F.3d at 663, 668 (striking a juror because of the juror's religion would be plain error even though Circuit had never explicitly addressed religious-based challenges).

481 U.S. 279, 348-49 (1987) (noting that court rejects "application of harmless-error analysis in cases involving racial discrimination that 'strike[ ] at the fundamental values of our judicial system and our society as a whole'").

## Conclusion

For the reasons set forth above and in appellant's main brief, the Court should reverse Mr. Barro's conviction and dismiss the indictment or remand for the district court to reconsider its speedy trial decision (Point I); or the Court should reverse Mr. Barro's conviction and remand for a new trial (Point II).

Dated: New York, New York
     March 22, 2016

                    Respectfully submitted,

                    /s/_____
                    **ALLEGRA GLASHAUSSER**
                    FEDERAL DEFENDERS OF NEW YORK,
                    INC., APPEALS BUREAU
                    52 Duane Street, 10th Floor
                    New York, New York 10007
                    (212) 417-8742

                    *Counsel for Defendant-Appellant*
                    *Sherman Barro*

ALLEGRA GLASHAUSSER,
   *Of Counsel*

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2016 I electronically filed the foregoing with the court's CM/ECF system, which will send notification of such filing to the counsel for all parties in these cases.

Dated:  New York, New York
       March 22, 2016

/s/_____
**ALLEGRA GLASHAUSSER**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This reply brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

       this reply brief contains 5,617 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

       this reply brief has been prepared in a monospaced typeface using **MICROSOFT WORD** with **14 characters per inch in Garamond** type style.

Attorney for Appellant **SHERMAN BARRO**

Dated:  New York, New York
       March 22, 2016

/s/_____
**ALLEGRA GLASHAUSSER**